HADFIELD v OAKLAND COUNTY DRAIN COMMISSIONER

VEENEMAN v MICHIGAN

LANDRY v DETROIT

McCAUL v VILLAGE OF LAKE ODESSA

Docket Nos. 75494, 76815, 77011, 78233. Argued November 14, 1986 (Calendar Nos. 2-5). Decided March 29, 1988. Rehearing denied in *Landry, post,* 1202.

Glen R. Hadfield and Jane P. Hadfield brought an action in the Oakland Circuit Court against the Oakland County Drain Commissioner, and others, alleging that the defendants' failure to prevent the installation by private landowners of culverts along certain county drains and the subsequent failure to remove the culverts resulted in the obstruction of the drains and caused permanent damage to the plaintiffs' land, deprived the plaintiffs of the use of their land, amounting to an unconstitutional taking without compensation, and that the large accumulation of standing water on the plaintiffs' land was a public nuisance. The plaintiffs sought mandamus to compel the immediate removal of the drains. The court, Farrell E. Roberts, J., granted summary judgment for the defendants relative to the trespass and mandamus counts, and dismissed the count alleging a taking, addressing only the allegation of public nuisance. The court found that while there is a judicially created exception to governmental immunity where a plaintiff has alleged intentional nuisance the plaintiffs' proofs with respect to the allegation of public nuisance had failed. The court further held that the plaintiffs had established the existence of a private nuisance created by the defendants, but found requisite intent only with respect to the drain commissioner, and awarded plaintiffs one percent of the damages sought. The plaintiffs appealed the damage award without seeking a new trial or a modification of the award. The defendants cross-appealed on the issue of governmental immunity. The Court of Appeals, ALLEN, P.J., and V. J. BRENNAN and DANIELS, JJ., affirmed in an unpublished opinion per curiam, holding that the trial court properly found that the defendants had created and maintained an intentional nuisance, and that absent a motion for a new trial in the trial court review of the

adequacy of an award is not permitted unless there was insufficient evidence to support the verdict (Docket No. 68789). The plaintiffs appeal, and the defendants cross-appeal.

Howard Veeneman, as personal representative of the estate of Jay Veeneman, deceased, brought an action in the Oceana Circuit Court against the State of Michigan for damages arising from the fatal injury of Jay Veeneman in an off-the-road vehicle accident in Silver Lake State Park. The plaintiff alleged negligence in the state's failure to inspect and regulate the operation of off-road vehicles and to provide adequate medical personnel, and nuisance in fact in the state's improper regulation of off-road vehicles and its awareness of previous deaths and injuries of a similar nature in the area and failure to correct the problem. The court, Terrence R. Thomas, J., granted summary judgment for the defendant, holding that the action was barred by governmental immunity and the recreational user act, and permitted the plaintiff to amend his complaint to add counts of intentional nuisance, negligent nuisance, and gross negligence or wilful and wanton misconduct. Thereafter, the court granted summary judgment for the defendant and entered a final order dismissing the case. The Court of Appeals, R. M. MAHER and REILLY, JJ. (M. J. KELLY, P.J., concurring in part and dissenting in part), affirmed in part and reversed in part in an opinion per curiam, finding that the action was barred by governmental immunity except as to plaintiff's allegation of intentional nuisance and that the action was not barred under the recreational user act (Docket No. 72022). The defendant appeals.

Brenda Landry and Emmett Landry brought an action in the Wayne Circuit Court against the City of Detroit and the Detroit-Wayne Joint Building Authority, seeking to recover damages for personal injuries suffered by the plaintiffs when they were attacked in a courtroom of the Recorder's Court of Detroit. The plaintiffs alleged liability, inter alia, on the basis of the common-law nuisance and statutory public-buildings exception to governmental immunity. The court, Michael L. Stacey, J., granted summary judgment for the defendants and dismissed the complaint, articulating no basis for its ruling on the record. The Court of Appeals, HOOD, P.J., and LIVO, J. (M. J. KELLY, J., concurring in part and dissenting in part), affirmed in part and reversed in part, finding summary judgment inappropriately applied to the plaintiffs' claim of intentional nuisance (Docket No. 70836). The city appeals.

Burton E. McCaul and Doris R. McCaul brought an action in the Ionia Circuit Court against Lake Odessa Village and others,

seeking damages resulting from the release of sewage water onto their farmland from the village's sewage treatment plant. The plaintiffs alleged negligence and nuisance. The court, Charles W. Simon, Jr., J., granted summary judgment for the defendants, holding that the plaintiffs had alleged only ordinary and not intentional nuisance and that their negligence claim was barred by governmental immunity under the guidelines of *Ross v Consumers Power Co,* 420 Mich 567 (1984). The Court of Appeals, R. M. MAHER, P.J., and ALLEN and LAMB, JJ., affirming in part and reversing in part in an unpublished opinion per curiam, reversed the trial court's grant of summary judgment, finding that the nuisance exception to governmental immunity had survived *Ross* and that the plaintiffs had sufficiently pled intentional nuisance (Docket No. 83172). The defendant appeals.

In opinions by Justice BRICKLEY, joined by Chief Justice RILEY and Justice CAVANAGH, by Justice BOYLE, and by Justice LEVIN, the Supreme Court *held:*

The actions in *Hadfield* and *McCaul* may be maintained; the actions in *Veeneman* and *Landry* may not.

Justice BRICKLEY, joined by Chief Justice RILEY and Justice CAVANAGH, stated that a direct trespass upon, or the interference with the use or enjoyment of, land that results from a physical intrusion caused by, or under the control of, a governmental entity is not immune from tort liability.

1. Governmental agencies are immune from tort liability where the agency is engaged in the exercise or discharge of a governmental function, unless otherwise excepted by statute or case law, including liability for nuisance as recognized at common law. The nuisance exception to governmental immunity is limited according to the historically recognized cause of action which grew out of the distinction between an action of trespass and an action on the case. Trespass is an invasion of an interest in the exclusive possession of land. Nuisance, is an interference with the use and enjoyment of an interest in the land.

2. Prior to the enactment of the governmental tort liability act, the nuisance exception to governmental immunity was confined to cases involving trespass or intruding nuisance and was grounded on the Taking Clause of the Michigan Constitution. In analogous cases decided after enactment, the Taking Clause was also applied. The strong link between the common-law trespass-nuisance exception and the Taking Clause of the constitution, combined with the long history of the exception, is persuasive of an intent to preserve the exception in its estab-

lished form in the governmental immunity act. Thus, the defense of governmental immunity may be avoided where a cause of action in trespass or intruding nuisance is alleged and proven.

3. In *Hadfield,* the exception is applicable, and the county drain commissioner may be held liable. With regard to the question of damages, the trial court failed to make findings of fact dispositive of the issue. Thus, remand is required to the circuit court for further and more specific findings of fact, an award of damages based on those findings, and the taking of further evidence relating to the amount of damages resulting from the defendants' actions or failure to act, if necessary. Prior review by a trial court is not necessary to preserve for appeal the question whether the trial court made findings of fact pursuant to GCR 1963, 517.1.

4. In *Veeneman,* the exception does not apply, and there is no basis for holding the state liable.

5. In *Landry,* the exception does not apply.

6. In *McCaul,* the plaintiffs set forth sufficient allegations of a trespass-nuisance to avoid the defendant's assertion of governmental immunity.

Justice BOYLE, concurring, agreed that the Legislature intended to codify the common law of governmental immunity in enacting the governmental tort liability act and that traditional trespass-nuisance or private nuisance is an exception to governmental immunity under Michigan common law. However, the common law does not require that a private remedy for public nuisance be limited to the remedy sought for an invasion directly analogous to trespass nuisance.

Nuisance per se also is an exception to governmental immunity. Unlike nuisance in fact, it is not predicated on a want of care, but is unreasonable by its very nature. The state may not avoid liability for a nuisance per se by asserting immunity; to hold otherwise would allow the state to use its property without regard for private persons or the public at large.

Justice LEVIN, writing separately, agreed that an action for nuisance may be maintained in *Hadfield* and *McCaul;* also agreed that on the facts of *Veeneman* and *Landry* an action for nuisance cannot be maintained; and agreed with Justice BOYLE that the governmental immunity act does not preclude an action for damage for loss caused by a public nuisance or a nuisance per se.

*Hadfield,* affirmed and remanded for further proceedings.

*Veeneman* and *Landry,* reversed.

*McCaul,* affirmed and remanded for trial.

Justice ARCHER, concurring in part and dissenting in part, stated that the majority's definition of the tort of trespass-nuisance is too narrow. Trespass, nuisance, intentional nuisance, as well as nuisance per se should be held to be exceptions to governmental immunity.

Exceptions to governmental immunity which existed prior to the enactment of the governmental tort liability act were retained by the Legislature. Additional exceptions were provided by statute. It was intended that the development of case law in this area continue. In describing the scope of the nuisance exception, it is important to focus on the responsibility of government for its actions or omissions, not its immunity from liability.

There is no need to characterize governmental actions or omissions as creating conditions amounting to a taking in a constitutional sense to grant relief. These tort issues are adequately addressed by case law. Nor must nuisance amount to an invasion occurring on other than the government's property. If a governmental unit acts or fails to act and thereby creates a nuisance, the unit should be liable regardless of where the trespass or nuisance occurs. There should be no requirement of a physical invasion of a plaintiff's land for the governmental unit to be liable. In considering whether a nuisance in fact was created, the trier of fact should consider, first, whether it was created intentionally or negligently, and, second, whether the condition created or resulting rose to the level of an intentional nuisance because of a failure to correct the condition.

143 Mich App 16; 371 NW2d 466 (1985) reversed.

143 Mich App 694; 373 NW2d 193 (1985) reversed.

Justice GRIFFIN took no part in the decision of these cases.

*Gualtieri & Hyde, P.C.* (by *Roger Q. Hyde*), and *Turner & Turner, P.C.* (by *Donald A. Turner*), for plaintiffs Hadfield.

*Napieralski, Walsh & Velzen, P.C.* (by *Randall L. Velzen*), for plaintiff Veeneman.

*Paul D. Sherr, P.C.,* for plaintiffs Landry.

*Rhoades, McKee & Boer* (by *Michael W. Betz*) for plaintiffs McCaul.

*Kohl, Secrest, Wardle, Lynch, Clark & Hampton*

(by *William P. Hampton* and *Lanie Anderson*) for the defendants in *Hadfield.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Thomas L. Casey,* Assistant Solicitor General, and *A. Michael Leffler* and *Clive D. Gemmill,* Assistant Attorneys General, for the defendant in *Veeneman.*

*Donald Pailen,* Corporation Counsel, and *William L. Woodard* and *Dennis A. Mazurek,* Assistant Corporation Counsel, for the defendants in *Landry.*

*Foster, Swift, Collins & Coey, P.C.* (by *James D. Adkins* and *T. Neil Bemenderfer*), for the defendants in *McCaul.*

Amici Curiae:

*Stanton, Bullen, Nelson, Moilanen & Klaasen, P.C.* (by *Charles A. Nelson*), for the City of Jackson.

*Mogill, Posner, Cohen & Weiss* (by *Marjory B. Cohen*) for Michigan Trial Lawyers Association.

BRICKLEY, J. These four consolidated cases present the issue whether a nuisance exception to governmental immunity remains viable after this Court's decision in *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984), and, if so, in what form. Consideration of this question necessitates review of two pre-*Ross* decisions in which this Court was divided over the proper scope of the nuisance exception. See *Rosario v City of Lansing,* 403 Mich 124; 268 NW2d 230 (1978); *Gerzeski v Dep't of State Hwys,* 403 Mich 149; 268 NW2d 525 (1978). There are also

three minor issues that are resolved in the context of their respective cases.

In response to the primary question, we hold that there is a limited trespass-nuisance exception to governmental immunity. The trespass-nuisance exception has a long history in Michigan jurisprudence, it has a strong policy basis in the Michigan Constitution, and its continuing viability comports well with the language of the governmental tort liability act and the *Ross* decision.

Trespass-nuisance shall be defined as a direct trespass upon, or the interference with the use or enjoyment of, land that results from a physical intrusion caused by, or under the control of, a governmental entity. Damages may be awarded for injury to person or property.

Employing the same historical standard, we reject other versions of the nuisance exception that are unsupported in the relevant case law. Having found some historical evidence of a nuisance per se exception and of a limited public nuisance exception, we leave for another day the question whether such exceptions are sufficiently supported by precedent so as to exist independent of trespass-nuisance and, if so, the issue of their proper scope.

I

The threshold question presented here is whether, in light of the governmental tort liability act and *Ross, any* common-law tort-based exception to governmental immunity may be recognized. We conclude that a reaffirmation of the historic trespass-nuisance exception is not only permitted, but required, by the language of § 7 of the act.

Section 7 of the governmental tort liability act provides:

Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed. [MCL 691.1407; MSA 3.996(107).]

Tort liability may arise out of the performance of a proprietary, as opposed to a governmental, function. See MCL 691.1413; MSA 3.996(113). In addition, the statutory exceptions of § 7 impose liability for: the failure to maintain highways in reasonable repair, MCL 691.1402; MSA 3.996(102); the negligent operation of a government-owned motor vehicle by a government officer, agent, or employee, MCL 691.1405; MSA 3.996(105); and the failure to repair and maintain public buildings under government control, MCL 691.1406; MSA 3.996(106). In *Ross, supra,* p 618, we characterized § 7 as a "broad grant of immunity" with "four narrowly drawn statutory exceptions."

Defendants-appellants in *Veeneman v Michigan* and *McCaul v Village of Lake Odessa,* and defendants-appellees in *Hadfield v Oakland Co Drain Comm'r* argue against *any* judicially created exceptions, and would have us interpret § 7 so as to confine liability to the specifically enumerated statutory exceptions. We reject this narrow interpretation because it fails to recognize the second sentence of § 7. "[T]his act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed."[1]

---

[1] Prior to the passage of 1986 PA 175, the last sentence of § 7 read, "[T]his act shall not be construed as modifying or restricting the

Taken alone, the first sentence of § 7 does support a narrow interpretation of the act, to preclude recognition of any nuisance exception. The Legislature's use of the word "tort" to describe the liability from which governmental agencies are to be held immune exemplifies the breadth of the intended immunity.[2] There is no doubt that nuisance is a tort and that liability for nuisance would be within the scope of statutory governmental immunity as expressed in the first sentence of § 7.

However, the second sentence of § 7 retains preexisting governmental immunity law except where provided otherwise in the act. In *Thomas v Dep't of State Hwys,* 398 Mich 1, 11; 247 NW2d 530 (1976), we interpreted the second sentence, noting, "[o]bviously this language must be construed as an 'affirmation' of case-law precedent on the subject of the state's immunity." More specifically, we note Justice RYAN's observations in his dissenting opinion in *Rosario, supra,* p 146:

> [I]n order to determine the scope of the now codified immunity, we must determine the scope of

immunity of the state from tort liability as it existed *heretofore,* which immunity is hereby affirmed." 1964 PA 170 (emphasis added). See n 16.

[2] The Legislature's intent that "tort" be taken to mean "all torts" may be culled from the action taken after this Court declared § 7 of the 1964 governmental immunity act unconstitutional as violative of the title-object clause, Const 1963, art 4, § 24. See *Maki v East Tawas,* 385 Mich 151; 188 NW2d 593 (1971). At the time of that decision, the title of the act read:

> An act to make uniform the liability of [governmental agencies] when engaged in a governmental function, for injuries to property and persons *caused by negligence* . . . .

Section 7 used the word "tort" as does the present version. Section 7 was found to be unconstitutional because it exceeded the scope of the act's title. In response to *Maki,* the Legislature amended the act's title, eliminating the words, "caused by negligence," 1970 PA 155, and thus eliminating any interpretation of "tort" to mean only tort liability arising out of negligence.

its antecedent "existing immunity." Since the common-law or "existing immunity" doctrine included certain judicially created exceptions which defined its limits, the legislatively codified immunity is limited and defined by the same exceptions. One of these exceptions is here in issue: the doctrine of "nuisance."[3]

Commentators have also found in the second sentence of § 7 a legislative intent to preserve the nuisance exception that had been recognized at common law.

The Michigan court has recognized this head of liability from the very beginning. It seemed so obvious to the nineteenth-century court that it was practically taken for granted, and it antedates the governmental-function defense by decades. It reflects one of the strongest claims for relief that can be asserted . . . . There is nothing in their public expressions to indicate that those who drafted the statute had any such change in mind; indeed, one of them summed the statute up in these terms: "The net effect of Act 170, 1964, is to largely return to municipal corporations the position they enjoyed prior to the decision of the *Williams* [*v Detroit,* 364 Mich 231; 111 NW2d 1 (1961) (abrogating governmental immunity for municipalities)] case." This is surely a situation where the legislature should be expected to express an intent to make an important change in the law in words incapable of being misunderstood, rather than relying upon implication. On this basis the sentence can justifiably be construed to avoid the consequence that the words, in the abstract, seem to suggest. The term governmental function has no clear and indisputable core of meaning. It is a term of art, definable only by reference to the instances to which it has been applied. It has

[3] Of course, Justice Ryan advocated recognition of a nuisance exception with a slightly different scope than that adopted today. See n 7.

never been applied by the Michigan court to pro-
tect any governmental agency against liability in a
situation recognized to be within the nuisance-tres-
pass category. This sentence, I submit, should be
seen as a restoration of the governmental-function
defense as it existed in the case law, alongside the
nuisance-trespass head of liability. [Cooperrider,
*The court, the legislature, and governmental tort
liability in Michigan*, 72 Mich L R 187, 279-280
(1973).]

See also DeMars, *Intentional nuisance in fact:
Should it be a bar to a governmental function
defense in Michigan?*, 1981 Det C L R 771, 790.

We agree with these authorities on this point
and with Justice RYAN's interpretation of § 7.
While the defendants' arguments, advocating rec-
ognition of only statutory exceptions, are tempt-
ingly simple and straightforward, they negate or
ignore the second half of the legislative mandate
of § 7. That section requires a continuation of the
nuisance exception as formulated prior to the
enactment of the governmental immunity act in
1964, as amended by 1970 PA 155. Thus, an under-
standing of nuisance generally and of the history
of the nuisance exception to governmental immu-
nity prior to the act will facilitate articulation of
the limited exception that we adopt here and
apply to the cases at bar.

II

To find that there existed a common-law nui-
sance exception to governmental immunity and
that that exception survived through the passage
of the second sentence of § 7 of the governmental
tort liability act does not answer the more difficult
aspect of the question presented. As we noted in
*Ross,* the Legislature intended a broad grant of

immunity; thus, any liability for nuisance must be carefully limited according to the parameters of that historically recognized cause of action. Thus, the reasoning and rationale of pre-governmental immunity act cases must provide a formula for any nuisance exception that may be said to have been embraced by the Legislature through the language of § 7.

Because nuisance as a legal concept is difficult, if not impossible, to define,[4] we take great pains to describe the type of liability to which governmental entities are exposed under the nuisance exception adopted today. It is not enough to say that there is a "nuisance" exception to governmental immunity. This Court has commented on the amorphous nature of a nuisance action:

> Nuisance is the great grab bag, the dust bin, of the law. It comprehends interference with an owner's reasonable use and enjoyment of his property by means of smoke, noise, or vibration; the obstruction of private easements and rights of support; interference with public rights, such as free passage along streams and highways, the enjoyment of public parks and places of recreation, and, in addition, activities and structures prohibited as statutory nuisances. . . . In short, nuisance . . . "is a good word to beg a question with. It is so comprehensive a term, and its content is so heterogeneous, that it scarcely does more than state a legal conclusion that for one or another of widely varying reasons the thing stigmatized as a nuisance violates the rights of others." [*Awad v McColgan,* 357 Mich 386, 389-390; 98 NW2d 571 (1959).]

---

[4] We observed in the past:

[A]djudicated cases have been so variable that courts generally regard a technical and comprehensive definition [of nuisance] difficult if not impracticable . . . . [*Kilts v Kent Co Bd of Supervisors,* 162 Mich 646, 651; 127 NW 821 (1910).]

Nuisance originally grew out of the distinction between the old action of trespass and the action on the case. "[T]respass is an invasion of the plaintiff's interest in the exclusive possession of his land, while nuisance is an interference with his use and enjoyment of it." Prosser & Keeton, Torts (5th ed), § 87, p 622. Nuisance generally, however, goes well beyond the basic definition into broad areas of liability. Because the concepts of trespass and "classic" nuisance are so close, we include both trespass and trespassory nuisance within the exception adopted today.

There are two basic types of nuisance: public and private. They "have almost nothing in common, except that each causes inconvenience to someone . . . ." Prosser & Keeton, *supra,* p 618. The Restatement observes:

> Notwithstanding the absence of any real relation or connection between public and private nuisance that is readily apparent, the use of the same name for both has resulted in the application of the same rules to the two, with only minor differences due to the distinct character of the two types of interests invaded. [4 Restatement Torts, 2d, Introductory Note to ch 40, p 85.]

"A private nuisance is a civil wrong, based on a disturbance of rights in land." Prosser & Keeton, *supra,* p 618. A public nuisance is a "criminal offense, consisting of an interference with the rights of the community at large . . . ." *Id.* The Restatement defines public nuisance as "an unreasonable interference with a right common to the general public." 4 Restatement Torts, 2d, § 821B, p 87. Prosser & Keeton describe the overlap between public and private nuisance: When "the individual interest that the public nuisance is designed to protect is the type protected under tort law, then

the conduct that is regarded as a public nuisance will quite often be regarded also as either a private nuisance or some other tort to those who are adversely affected." *Id.,* § 90, p 652.

In Michigan, public nuisance is governed by statute, see MCL 600.3801 *et seq.;* MSA 27A.3801 *et seq.,* as well as common law. Under the public nuisance act, the Attorney General, prosecuting attorneys, and citizens are empowered to bring actions to abate activities defined as public nuisances.[5] See Prosser & Keeton, *supra,* § 90, p 652; MCL 600.3805; MSA 27A.3805. "At common law, acts in violation of law constitute a public nuisance. Harm to the public is presumed to flow from the violation of a valid statute enacted to preserve public health, safety and welfare." *Attorney General v Peterson,* 381 Mich 445, 465; 164 NW2d 43 (1969).[6]

Two additional categories are nuisance per se and nuisance in fact or "per accidens." This Court has explained that difference:

"From the point of view of their nature, nuisances are sometimes classified as nuisances *per se* or at law, and nuisances *per accidens* or in fact. A nuisance at law or a nuisance *per se* is an act, occupation, or structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings. Nuisances in fact or *per accidens* are those which become nuisances by reason of circumstances and surroundings, and an act may be found to be a nuisance as a matter of

[5] Generally, we do not view actions seeking only equitable relief, such as abatement or injunction, as falling within the purview of governmental immunity. See n 15.

[6] The trespass-nuisance exception as defined herein does not distinguish between public and private nuisance, but encompasses both categories, as long as the prerequisites of trespass-nuisance are met.

Whether there exists a limited public nuisance exception, analogous to trespass-nuisance but without the private property interest, remains an open question. See n 16.

fact where the natural tendency of the act is to create danger and inflict injury on person or property. The number of nuisances *per se* is necessarily limited, and by far the greater number of nuisances are nuisances *per accidens."* [*Rosario, supra,* pp 132-133 (opinion of FITZGERALD, J.), quoting *Bluemer v Saginaw Central Oil & Gas Service, Inc,* 356 Mich 399, 411; 97 NW2d 90 (1959).]

Nuisance in fact has been divided into two further subclasses of nuisance: intentional and negligent. *Gerzeski, supra,* p 158. In *Dahl v Glover,* 344 Mich 639, 644; 75 NW2d 11 (1956), the Court approved jury instructions that described nuisance per se as well as the two types of nuisance in fact. See also *Denny v Garavaglia,* 333 Mich 317, 331; 52 NW2d 521 (1952).

These distinctions—between nuisance per se and nuisance in fact, and between intentional nuisance in fact and negligent nuisance in fact—became the foundation for the differences of opinion in *Rosario* and *Gerzeski.* Thus, with this brief introduction to the concept of nuisance generally, we turn to the question of the proper scope of the nuisance exception to governmental immunity in light of our interpretation of § 7 and *Ross.*

III

The various opinions in the *Rosario* and *Gerzeski* cases represent a partial menu of the options available when considering the appropriate scope of the nuisance exception. There has been no clear majority for any one view, and, given that our opinion in *Ross* redefined the entire governmental-immunity landscape, we are compelled at this point to analyze the issue in a fresh light. The nuisance exception that we now recognize is not one advanced by any one of the opinions in those

cases, but, rather, is one that best reflects the exception as it existed at common law, prior to the adoption of the governmental tort liability act. Of the *Rosario* and *Gerzeski* opinions, only Justice RYAN's dissenting opinions employed this historical approach, which we find to be required by the second sentence of § 7.

A

There is a great deal of historical precedent in favor of the first prong of the nuisance exception advocated by the *Rosario* and *Gerzeski* dissents. Justice RYAN referred to it as an exception for "intruding nuisance,"[7] *Gerzeski, supra,* p 171, and Professor Cooperrider terms it the "nuisance-trespass" exception. Cooperrider, *supra,* p 280. We find that this type of nuisance was clearly recognized at common law prior to the enactment of the governmental tort liability act, and that the Legislature intended to preserve it by the second sentence of § 7.

The earliest cases to recognize governmental

---

[7] Justice RYAN described intruding nuisances as "situations wherein damage is caused by the direct trespass of an instrumentality *from government-owned land* onto private property." *Gerzeski, supra,* p 169 (emphasis added). We do not adopt the source limitation on the exception that might be inferred from the emphasized language of Justice RYAN's opinion.

Such a limitation would be illogical and inconsistent with the "taking" rationale. While some of the early trespass-nuisance cases did involve an intrusion "from government-owned land," see, e.g., *Ferris v Bd of Ed,* 122 Mich 315; 81 NW 98 (1899) (ice and snow falling off the roof of school buildings), most of the flooding cases, for example, did not involve water that originated from state land, but, rather, water that the defendant government was directly responsible for controlling.

Justice RYAN may have been confusing the origin of the intrusion with the requirement that the injury occur *outside* the defendant's property. See, e.g., *Kilts v Kent Co Bd of Supervisors,* 162 Mich 646; 127 NW 821 (1910); Daniels v Grand Rapids Bd of Ed, 191 Mich 339; 158 NW 23 (1916). That requirement, of course, remains part of the exception, as does the causation or control element.

liability[8] involved some type of direct invasion by the government entity of the plaintiffs' land. The actions were characterized either as trespass or nuisance, but invariably focused on the aspect of direct, physical invasion. This focus stemmed from the primary rationale for imposing liability: The "Taking" Clause of the constitution, beginning in Const 1835, art 1, § 19, and continuing through our present constitution, Const 1963, art 10, § 2, guarantees that the property rights of citizens are protected from governmental taking "without just compensation." Trespassory invasions that stopped short of being "takings" of property were considered actions for which governmental entities should not escape liability.

The earliest trespass-nuisance case was an action against the City of Saginaw for damages

---

[8] In *Ross, supra,* pp 596-608, we discussed the historical difference between sovereign (state) immunity and governmental immunity, which applied to "inferior" divisions of government when engaged in governmental functions. The rationale for governmental immunity was originally derived from sovereign immunity:

> The true theory is that the township or city represents the State in causing these things to be done, and, like the State, it enjoys immunity from responsibility in case of injury to individuals . . . [because in] imparting a portion of its powers, the State also imparts its own immunity. [*Nicholson v Detroit,* 129 Mich 246, 258-259; 88 NW 695 (1902).]

*Williams v Detroit,* 364 Mich 231; 111 NW2d 1 (1961), abrogated common-law governmental immunity for municipalities, and the same for counties, townships, and villages was abolished in *Myers v Genesee Co Auditor,* 375 Mich 1; 133 NW2d 190 (1965), and *Keenan v Midland Co,* 377 Mich 57; 138 NW2d 759 (1966). However, in 1964, the governmental tort liability act, specifically, "[t]he first sentence of § 7[,] was intended to not only restore governmental immunity to nonsovereign governmental agencies, but to provide uniform treatment for state and local agencies." *Ross, supra,* p 605.

Thus, there was a period of time between 1961 and 1964 when municipalities were not covered by governmental immunity. The first sentence of § 7 of the act established statutory immunity and required application of uniform standards to all governmental units; the second sentence of § 7 incorporated the earlier common law of governmental immunity into the statute.

caused by surface water that was thrown upon the plaintiff's land from ditches created and maintained by the city. This Court, without discussing liability in terms of governmental immunity, opined "that the city, by creating the nuisance, which the evidence offered tended to prove, is prima facie liable for its continuance." *Pennoyer v Saginaw,* 8 Mich 534, 535 (1860). The defendant's actions in *Pennoyer* may be characterized as either trespass or nuisance.

In *Sheldon v Kalamazoo,* 24 Mich 383 (1872), the plaintiff sued the city over the removal of his fence, which the city claimed "encroached" on the line of a road. The plaintiff had offered to show that his fence was on his property. Referring to the injury as a "wilful trespass," the *Sheldon* Court employed a taking analysis to this case of municipal "invasion":

> If the property in dispute is not subject to the public easement asserted, then the village of Kalamazoo has taken possession of property it could not lawfully appropriate without a legal condemnation. There is no authority that we can find which holds such an invasion of private lands not to be an act of the corporation, and none which would exempt the corporation from liability to an action for the wrong. [*Id.,* pp 386-387.]

*Ashley v Port Huron,* 35 Mich 296 (1877), involved property damage due to flooding. The flooding was caused by the cutting of a sewer "under the direction of the city authorities, and under city legislation the validity of which is not disputed." *Id.,* p 297. In an opinion by Chief Justice COOLEY, the *Ashley* Court articulated the issue as one of governmental immunity. The trial court had apparently directed a verdict in favor of the defendant, on the ground

that the city, in ordering the construction of the
sewer and in constructing it, was acting in the
exercise of its legislative and discretionary author-
ity, and was consequently exempt from any liabil-
ity to persons who might happen to be injured.
[*Id.,* p 297.]

Chief Justice COOLEY noted first:

But it is not strictly the failure to construct
sewers to carry off the water that is complained off
[sic] in this case; it is of the positive act of casting
water upon the plaintiff's premises by the sewer
already constructed. [*Id.,* p 300.]

He approved of an analogous Massachusetts case
that had affirmed "the clear liability of the defen-
dant where the injury was accomplished *by an
actual invasion of another's premises . . . .*" *Id.,*
pp 300-301 (emphasis added).

Expressing the general rule to be applied in
these situations, the *Ashley* Court again empha-
sized a "taking" rationale for imposing liability on
municipal defendants:

It is very manifest from this reference to author-
ities, that they recognize in municipal corporations
no exemption from responsibility where the injury
an individual has received is a direct injury accom-
plished by a corporate act which is in the nature
of a trespass upon him. *The right of an individual
to the occupation and enjoyment of his premises is
exclusive, and the public authorities have no more
liberty to trespass upon it than has a private
individual.* If the corporation send people with
picks and spades to cut a street through it without
first acquiring the right of way, it is liable for a
tort; but it is no more liable under such circum-
stances than it is when it pours upon his land a
flood of water by a public sewer so constructed
that the flooding must be a necessary result. The

one is no more unjustifiable, and no more an actionable wrong, than the other. Each is a trespass, and in each instance the city exceeds its lawful jurisdiction. A municipal charter never gives and never could give authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of it for streets or buildings, or by flooding it so as to interfere with the owner's possession. His property right is appropriated in the one case as much as in the other.

A like excess of jurisdiction appears when in the exercise of its powers a municipal corporation creates a nuisance to the injury of an individual. The doctrine of liability in such cases is familiar, and was acted upon in *Pennoyer* . . . . [*Id.,* p 301. Emphasis added. Citations omitted.]

*Rice v Flint,* 67 Mich 401; 34 NW 719 (1887), also fits within the trespass-nuisance category, although *Rice* does not mention the immunity defense. In *Rice,* the plaintiff's building foundations were damaged when the city changed the grade of the nearby street, causing flooding on the plaintiff's land. Citing *Ashley* and *Pennoyer,* the Court held:

For a direct act which causes water to flow upon the premises of another to his injury a municipality is responsible. A city has no more right to invade or cause the invasion of private property than an individual. [*Id.,* p 403.]

In *Seaman v City of Marshall,* 116 Mich 327; 74 NW 484 (1898), the alleged negligence on the part of the defendant city was in issue. Seaman sued the city for damages to his basement caused by accumulated water that flowed there because a

sewer or drain tile was inadequate to carry off storm water.

The general rule to be applied was stated:

> [T]he city is required to use due caution, and if, through its negligence in not providing reasonably efficacious means to take care of the water that it should reasonably expect to accumulate by reason of its gutters, a person is injured by the overflow upon his premises of water collected by the sewers, and brought to such premises, and which would not otherwise have invaded them, the city is liable for the damages. [*Id.,* p 330.]

Thus, liability was premised not on an official decision of the municipality that resulted in damage, but on the negligence of the city in not allowing for the foreseeable harm when it designed the sewer system. Negligence was found in the city's failure to "remov[e] obstructions, or for constructing a gutter which it should have known, or have reasonably expected, would bring water to the point in controversy faster than the means provided could reasonably be expected to take care of it . . . ." *Id.,* p 331.

This trend toward liability in trespass-nuisance cases involving negligence was continued in *Ferris v Bd of Ed,* 122 Mich 315; 81 NW 98 (1899), which, for the first time, allowed recovery for personal injuries rather than property damage. In *Ferris,* snow and ice had fallen off the roof of a school building onto the plaintiff's property. The plaintiff sued for injuries he incurred when he slipped and fell on the accumulated ice. The trial court had held that a municipal corporation could not be held liable for negligence. On appeal, the plaintiff argued that "where the injury is the result of the *direct act or trespass* of the municipality, it is

liable, no matter whether acting in a public or private capacity." *Id.*, p 318 (emphasis added).[9]

Citing *Rice, supra,* the *Ferris* Court approved of the plaintiff's argument:

> The plaintiff had the right to the exclusive use and enjoyment of his property, and the defendant had no more right to erect a building in such a manner that the ice and snow would inevitably slide from the roof, and be precipitated upon the plaintiff's premises, than it would have to accumulate water upon its own premises, and then permit it to flow in a body upon his premises. *It has been many times held in this court that a city has no more right to invade, or cause the invasion of, private property, than an individual.* [*Id.*, p 318. Emphasis added.]

The *Ferris* Court noted that the action was not based on

> a neglect in the performance of a corporate duty rendering a public work unfit for the purposes for which it was intended, but the doing of a wrongful act, causing a direct injury to the person of the plaintiff, while outside the limits of the defendant's premises. [*Id.*, p 319.]

---

[9] *Alberts v Muskegon,* 146 Mich 210; 109 NW 262 (1906), emphasized the direct trespass element of *Ferris,* when it distinguished *Ferris* and found the defendant city protected by governmental immunity. *Alberts* held that the city was not liable for the destruction of the plaintiff's property by a fire caused by sparks that were ignited from a steamroller used by the city in repairing the street. The *Alberts* Court emphasized:

> The case at bar is not one of damages resulting from a direct trespass or from misfeasance of the city amounting to a trespass. It is a case of consequential injury resulting directly from the negligent conduct of the defendant's agents. [*Id.*, p 215.]

Apparently, at the time *Alberts* was decided, sparks were not considered to be a trespassory invasion. We note that under present law it is likely that such an invasion would constitute the requisite physical intrusion for trespass-nuisance.

The parameters of the exception as it applies to a nuisance originating in negligence were further defined in *Kilts v Kent Co Bd of Supervisors,* 162 Mich 646; 127 NW 821 (1910). In *Kilts,* the plaintiff's decedent was killed at a worksite where a tower collapsed due to insufficient support. The Court found that the county was performing a governmental function in contracting for the construction of the tower. Regarding the plaintiff's claim that the county should nevertheless be held liable because the tower was a nuisance, the Court stated that such a claim "would be an extension of the law of nuisance." *Id.,* p 649.

During this time period, cases involving trespass or a physical invasion of a plaintiff's land amounting to "classic" nuisance continued to form the basis of the exception. See, e.g., *Attorney General ex rel Wyoming Twp v City of Grand Rapids,* 175 Mich 503, 538; 141 NW 890 (1913). ("A city cannot, without direct legislative authority, pollute a stream with its sewage to the injury of lower proprietors. And it cannot be done by legislative authority without making compensation to the injured riparian owners.") *Donaldson v City of Marshall,* 247 Mich 357, 359; 225 NW 529 (1929), although not addressing governmental immunity directly, held that the city had a duty to maintain its drain so as to prevent the flow of water from causing accumulation on the plaintiff's land.

Generalizing from these early cases, it appears that where an invasion or intrusion onto a plaintiff's land occurred, the defendants were often found liable, regardless of whether the municipality acted directly, through an order perhaps, or whether its agents acted intentionally or negligently to produce the invasion. Consideration of the effect (the invasion), rather than of the act

that caused the effect, continued to be the primary focus through the 1950's.

For example, in *Robinson v Wyoming Twp,* 312 Mich 14; 19 NW2d 469 (1945), the defendant was held liable for the destruction of the plaintiff's property by fire. The fire was caused by a kerosene spill that resulted from flooding that occurred because of the way the township had constructed a park and lake. As a general rule, the *Robinson* Court stated:

> "That neither the public, in constructing highways, nor private parties for the benefit of their own lands, can turn water from its natural course onto the lands of another, is well settled." [*Id.,* p 24.]

*Robinson* held:

> From the evidence in the case at bar the jury could find that the township of Wyoming had so constructed its park and lake that the flooding of plaintiffs' property was a natural result from surplus water flowing out of the breakthrough in the embankment. The facts in this case take it out of the general rule that a municipality is not liable for the negligence of its officers and agents. [*Id.,* p 25.]

In *Rogers v Kent Bd of Co Road Comm'rs,* 319 Mich 661, 666; 30 NW2d 358 (1948), the Court found "a continuing trespass" in the county's failure to remove a metal post that had been part of a snow fence that it had installed with permission on the plaintiff's property. The plaintiff's decedent was killed when his tractor hit the post.

*Defnet v Detroit,* 327 Mich 254; 41 NW2d 539 (1950), and *Herro v Chippewa Co Road Comm'rs,* 368 Mich 263; 118 NW2d 271 (1962), represent more

recent applications of the exception to classic tres-
pass-nuisance situations. They reinforce this nar-
rower interpretation of the exception's scope,
while emphasizing the "taking" rationale.

In *Defnet,* the plaintiff was plagued by obnox-
ious fumes leaking from his fireplace and an even-
tual cave-in of his backyard, caused by an old
sewer that the defendant had informed him was
"blocked off." After further investigation, a per-
fectly functioning sewer was discovered running
under the plaintiff's property. The Court held:

> The maintenance of an active sewer since 1915
> beneath plaintiffs' lands constitutes a *trespass.*
> Although the sewer line break was under the
> Defnet property, that does not relieve the city
> from the damages caused by its *trespass. [Id.,* p
> 258. Emphasis added.]

Enunciating the general rule, and noting the "tak-
ing" connection, the *Defnet* Court concluded:

> The city cannot excuse its tortious taking of
> private property by invoking the shibboleth of
> governmental function. [*Id.*]

*Herro* was a wrongful death action stemming
from the breakthrough flooding of water that had
been impounded for purposes of the defendant's
road construction project. In addition to the death
of the plaintiff's decedent, the complete destruc-
tion of a private summer residence occurred. The
plaintiff, a visitor at the residence, alleged both
trespass and nuisance.

After citing and discussing *Ashley, Rice, Sea-
man, Ferris, Robinson,* and *Rogers,* and distin-
guishing the cases argued by the defendant, the
*Herro* Court referred to "the common-law right of
recovery for destructive water trespass, no matter

who the public or private trespasser-flooder might be . . . ." *Id.,* p 272. It expressed two general rules to be applied:

> The first is that—in Michigan—no city, village, township, county, or any administrative division thereof, has been held immune from liability for destructive flooding of private property occasioned by trespass, provided the trespass is pleaded and proved as in *Ashley* and like cases.
> The second is that *Ashley* . . . stands . . . for the proposition that even the State "could not intrude upon the lawful possession of a citizen . . . ." [*Id.*]

Finding that the plaintiff's action was not barred by governmental immunity, the Court also held that there should be no distinction between a continuing trespass and one occurring suddenly or directly.

Finally, in its conclusion, the *Herro* Court, like *Defnet,* stressed the "taking" rationale, quoting *Ashley:*

> "A municipal charter never gives and never could give authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of it for streets or buildings, or by flooding it so as to interfere with the owner's possession. His property right is appropriated in the one case as much as in the other." [*Id.,* p 275. Citations omitted.]

Although *Herro* emphasized the "taking" rationale and the need for some invasion of a private property interest, the plaintiff in *Herro* was merely a visitor on the land. Therefore, *Herro* makes clear that the plaintiff in an action claiming the trespass-nuisance exception need not be the owner of the land on which the invasion occurs.

B

As is evident from the above discussion of the early cases, the "Taking" Clause of the constitution[10] formed the basis of the trespass-nuisance exception as it evolved prior to 1964. Justice RYAN described the taking rationale:

> In [intruding-nuisance] cases the potentially dangerous instrumentality or condition literally moves from government-owned land onto adjacent property. Consequently, the neighboring premises and its occupants are subject to either the creation of a risk foreign to the premises or direct and immediate injury. When this transpires the government effectively deprives an owner of the useful possession of that which he owns. This Court views such action as a public taking. Under this analysis the state is obliged to pay reasonable compensation for damages ensuing from such "taking" in accordance with the Constitution of the State of Michigan, Const 1963, art 10, § 2. [*Gerzeski, supra,* p 170 (dissenting opinion). Citations omitted.]

Justice RYAN emphasized the interconnection of the Taking Clause and the trespass-nuisance exception even more explicitly when he stated:

---

[10] Const 1963, art 10, § 2 provides:

> Private property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law. Compensation shall be determined in proceedings in a court of record.

Direct reliance on this constitutional provision should not be confused with the assertion of the trespass-nuisance exception, however. In *Buckeye Union Fire Ins Co v Michigan,* 383 Mich 630; 178 NW2d 476 (1970), the Court found an unconstitutional taking. By contrast, Justice RYAN's opinion in *Gerzeski* and the other trespass-nuisance cases that cited the taking provision of the constitution merely employed that provision as a rationale for the judicially created rule that would impose liability in a tort setting involving governmental immunity.

[W]hen the "taking" is the result of an "intruding nuisance," the state cannot validly raise sovereign immunity from liability to avoid paying compensation to a damaged party. [*Gerzeski, supra,* p 171.]

In *Ashley, supra,* p 301, Justice COOLEY observed:

A municipal charter never gives and never could give authority to appropriate the freehold of a citizen without compensation, whether it be done through an actual taking of it for streets or buildings, or by flooding it so as to interfere with the owner's possession. His property right is appropriated in the one case as much as in the other.

As noted above, a taking rationale was also employed in *Sheldon, supra.* In *Defnet, supra,* p 258, the Court held that "[t]he city cannot excuse its *tortious taking* of private property by invoking the shibboleth of governmental function." (Emphasis added.)

In *Bator v Ford Motor Co,* 269 Mich 648; 257 NW 906 (1934), the defendant city had contracted for the defendant Ford Motor Company to lay water pipes. Damage to the plaintiff's building resulted from the work. Although the plaintiff had alleged breach of contract, negligence, and trespass, the Court employed a taking analysis in response to the defense of governmental immunity.

If private property cannot be taken by the public nor by a corporation for public use . . . , surely private property cannot be taken by the public for the use and benefit of a private corporation without at least just compensation. [*Id.,* pp 665-666.]

Likewise in *Herro, supra,* p 275, one of the cases

cited most often for the nuisance exception, we stated:

> [I]t remains true that where real estate is actually invaded by superinduced water, earth, sand, or other material, . . . it is a taking within the meaning of the Constitution.

In analogous post-1964 cases, this Court applied the Taking Clause as the basis of liability in situations that might have been characterized as trespass-nuisance according to the earlier definitions.[11] In *Buckeye Union Fire Ins Co v Michigan,*

[11] For example, in *Thom v State Hwy Comm'r,* 376 Mich 608; 138 NW2d 322 (1965), the following question was presented:

> [W]hen a governmental unit changes the grade of a highway in such a way as to diminish the value of an abutting owner's property by impairment of his right of access to the highway, [has] that owner's property . . ., to the extent of the diminution in its value, been "taken" for the public's use, thereby entitling the owner to just compensation therefor[?] [*Id.,* p 625.]

The Court responded affirmatively, but there was no majority opinion. The state highway department had made improvements in a highway that ran along one side of plaintiffs' property; as a result of the modifications, the highway was ten feet higher than plaintiffs' property and they had difficulty moving farm equipment on and off their land.

Justice SOURIS adopted the liberal definition of "taking" quoted above. Justice SOURIS would have overruled *Pontiac v Carter,* 32 Mich 164 (1875), which had held that one injured by the change of grade of an abutting street had no cause of action for damages.

Justice BLACK, in a separate opinion, saw no need to overrule *Carter,* in that the Court (specifically, Justice COOLEY) had expressly distinguished that case in *Ashley, supra,* and other cases. Justice BLACK noted that the "proof adduced by the [plaintiffs] establishes *both an actionable trespass* [citing *Ashley* and *Herro*] *and a taking* from them of a valuable property right . . . ." *Id.,* pp 633-634 (emphasis added).

Thus, Justice BLACK agreed that a taking had occurred because of the diminution in value of the plaintiffs' land. He found that causes of action alleging trespass and those alleging a partial taking both arise out of the "constitutional contract" evident in Const 1963, art 10, § 2. Quoting the Alabama Supreme Court, Justice BLACK described the Taking Clause as

383 Mich 630; 178 NW2d 476 (1970), although the plaintiff had alleged nuisance and this Court found nuisance, the holding was premised on the fact that an unconstitutional taking had occurred.[12] Damage to the plaintiff's property had been caused by a fire that spread from property owned by the state and found to be a fire hazard by the trial judge.

The two causes of action were treated synonymously. On the one hand, the *Buckeye* Court noted that the defendant's actions amounted to a taking. *Id.,* p 641. On the other hand, the Court observed that

> [t]he fire hazard which the state permitted to continue was a nuisance which *directly interfered* with the property of plaintiffs' subrogors and ultimately led to its damage. . . . There is no sovereign immunity applicable to a situation of *nuisance* as we have in this case. [*Id.,* pp 643-644. Emphasis added.]

Thus, there is a strong link between the common-law trespass-nuisance exception and the Tak-

"a constitutional contract made for the benefit of private property owners, and it is entirely reasonable to [infer] a contract on the part of the municipality in the instant case to pay the person injured a just remuneration for the damages sustained as a consequence of this public improvement, just as the Constitution guarantees." [*Id.,* p 637, quoting *Hunter v City of Mobile,* 244 Ala 318; 13 So 2d 656 (1943).]

Noting that it was unnecessary to address the immunity question, because the state had recently waived its immunity from suit, Justice BLACK concluded that the Taking Clause represented "judicial assurance that no one, not 'even the State,' can 'take' without having to pay according to the forms and remedies of law." *Id.,* p 638.

[12] Commentators have postulated that the Court in *Buckeye* would have found a trespass-nuisance had the defendant been a subordinate governmental unit, rather than the state. Cooperrider, *supra,* p 248. See DeMars, *supra,* p 780 ("[T]he court apparently believed that it could not assess liability against the state solely on the nuisance classification which derived from case law rather than statutory fiat").

ing Clause of the constitution. Combined with the long history of the exception, this constitutionally based policy provides a solid foundation for the reaffirmation of trespass-nuisance as a basis of governmental tort liability. The strong presence of trespass-nuisance in the case law prior to 1964, in light of its constitutional origins, persuades us that the Legislature intended, through the language of the second sentence of § 7, to preserve the exception in its established form.

Therefore, we find that plaintiffs will successfully avoid a governmental immunity defense whenever they allege and prove a cause of action in trespass or intruding nuisance. Trespass-nuisance shall be defined as trespass or interference with the use or enjoyment of land caused by a physical intrusion that is set in motion by the government or its agents and resulting in personal or property damage. The elements may be summarized as: condition (nuisance or trespass); cause (physical intrusion); and causation or control (by government).

C

We have limited the exception to the type of governmental nuisance liability that was recognized prior to 1964. As is evident from the historical analysis offered above, the vast majority of cases applying a nuisance exception to governmental immunity involved trespass or intruding nuisance. Utilizing the same approach, we thus reject several other versions of the exception, claimed by the plaintiffs in these cases, that would clearly extend the scope of the exception beyond that which was recognized in 1964, and would hence run contrary to legislative intent. Finally, we decline to address the question whether the nuisance

exception might be further extended to nuisances per se or to a form of public nuisance that would be directly analogous to trespass-nuisance. Such forms of the exception have some representation in the pre-1964 case law; however, the facts of the cases presented do not necessitate resolution of these issues.

1

Having found that an historical approach is mandated by the second sentence of § 7 of the governmental tort liability act, it is clear that the various versions of the "intentional nuisance" exception, which were formulated in *Rosario* and *Gerzeski,* are not encompassed by the legislative intent of that provision. There is no pre-1964 case law that recognizes or applies either an "intentional" or a "negligent" nuisance exception, in any form. Thus, it is unnecessary to become embroiled in the many complicated issues that were precipitated by the *Rosario* and *Gerzeski* opinions.

The trespass-nuisance exception focuses on the condition, rather than on the state of mind of the defendant. By contrast, Justice MOODY's opinions in *Rosario* and *Gerzeski* would have included all "intentional" nuisances within the scope of the exception. Justice FITZGERALD would have broadened the exception to include all nuisances, whether intentional or negligent. Because Justice MOODY was the "swing vote" in those decisions, his intentional-nuisance version of the exception has been adopted most often by the Court of Appeals.[13]

Both *Rosario* and *Gerzeski* originated in tragic accidents involving children. In *Rosario,* the plaintiff's decedent, nineteen months old, drowned in an

---

[13] See the instant cases in the Court of Appeals, as well as cases cited in footnote 14.

open sewer drain that existed allegedly because of the defendant's negligence. The plaintiff's complaint averred that the City of Lansing "knew or should have known that there was no top on said drain," that the drain "constituted an inherently dangerous condition," which the city had done nothing about. There was also a claim of "attractive nuisance."

Justice FITZGERALD, joined by Chief Justice KAVANAGH and Justice LEVIN, found that a broad nuisance exception existed and that the plaintiff had sufficiently pled nuisance in fact; therefore summary judgment based on governmental immunity was improper. The concept of attractive nuisance was held to be inapplicable to the facts of *Rosario.* Justice MOODY, joined by Justice WILLIAMS, concurred with that result, but would have applied the formulation of the intentional-nuisance exception that he described in his opinion in *Gerzeski.* Justice RYAN, joined by Justice COLEMAN, dissented.

In *Gerzeski,* two boys, ages ten and twelve, drowned in a pond that had been created by the defendant highway department when it "borrowed" soil for use in constructing a portion of I-75. Water from a preexisting drain, "a 'flowing well' beneath the surface of the borrow pit, and the water level of the surrounding lake combined to fill the pit with water." *Id.,* p 154. The boys had ventured out on the apparently frozen surface and had drowned at the point where the drain flowed into the pond. The father of one of the boys also drowned when he went out to look for them. The plaintiffs alleged attractive nuisance and gross negligence on the part of the highway department and the State Highway Commission.

Justice FITZGERALD, joined by Chief Justice KAVANAGH and Justice LEVIN, again advocated adop-

tion of an expanded nuisance exception. The Court of Appeals in *Gerzeski* had found that only trespass-nuisance and nuisance per se fell within the nuisance exception.

Justice Moody opined that "[t]o hold the government immune from the consequences of its intentional acts which create a nuisance would be . . . unconscionable." *Id.,* p 162. He would have found the governmental immunity defense inapplicable whenever the trier of fact finds that a governmental agency "intended to bring about the conditions which are in fact found to be a nuisance." *Id.*

It is obvious that neither *Rosario* nor *Gerzeski* involved a trespass-nuisance. Thus, the exception that is adopted today would not apply to either case. Because we perceive no pre-1964 historical basis for an intentional-nuisance exception, we find that no such exception exists, and we decline to enter the debate over the proper definition of intent. By adopting the historical approach that is mandated by the governmental tort liability act and *Ross,* we also avoid questions related to the sufficiency of the requisite intent—issues with which the Court of Appeals has grappled since *Rosario* and *Gerzeski.*[14]

---

[14] Justice Moody articulated an "intent[ ] to bring about the conditions which are in fact found to be a nuisance" standard, *Rosario, supra,* p 142, which is advocated by some Court of Appeals judges and by plaintiff-appellee in *Veeneman.* See *Martin v Michigan,* 129 Mich App 100, 112; 341 NW2d 239 (1983) (dissent); *Carney v Dep't of Transportation,* 145 Mich App 690; 378 NW2d 574 (1985) (concurrence). The majority of Court of Appeals panels hold that a plaintiff must show that the defendant either acted for the purpose of causing the harm or knew the harm was 'substantially certain' to follow." *Sanford v Detroit,* 143 Mich App 194; 371 NW2d 904 (1985). See, e.g., *Carney v Dep't of Transportation,* 145 Mich App 690; 398 NW2d 594 (1985); *Keiswetter v Petoskey,* 124 Mich App 590; 335 NW2d 94 (1983); *Martin v Michigan,* 129 Mich App 100; 341 NW2d 239 (1983); *Pate v Transportation Dep't,* 127 Mich App 130; 339 NW2d 3 (1983); *Pacini v Detroit,* 126 Mich App 1; 336 NW2d 882 (1983); *Crosby v*

Although the broadest version of the exception does not present as many problems of application, it is rejected for the same reasons as is the intentional-nuisance version. The broad view would include all nuisances—negligent and intentional—within the purview of the exception. There are undoubtedly policy reasons that support creation of such a broad interpretation of the exception, but those policies have been severely undercut by the governmental immunity act as interpreted by this Court in *Ross.*

In *Ross,* we addressed the Legislature's obvious intent to occupy the field of governmental immunity law, and we moved carefully to impose judicial construction only upon those terms in the statute that required interpretation. Therefore, endorsement of either of the majority options in *Rosario* or *Gerzeski* would contradict the clear import of *Ross.*

2

In addition to trespass-nuisance, Justice RYAN, in his *Rosario/Gerzeski* dissents, would have included nuisance per se as a basis of liability.

"[A] nuisance *per se* is an act, occupation, or

---

*Detroit,* 123 Mich App 213; 333 NW2d 557 (1983); *Ford v Detroit,* 91 Mich App 333; 283 NW2d 739 (1979).

To add to the confusion, some panels have found that allegations of omissions, as opposed to commissions, are automatically negligent rather than intentional. See, e.g., *Furness v Public Service Comm,* 100 Mich App 365; 299 NW2d 35 (1980); *Schroeder v Canton Twp,* 145 Mich App 439, 443; 377 NW2d 822 (1985). While others have found that use of the word "refused" is sufficient to take a pleading out of the negligent realm, and into the intentional. See, e.g., *Pacini v Detroit,* 126 Mich App 1; 336 NW2d 882 (1983); see *Rosario, supra,* p 143 (MOODY, J.). As Judge KAUFMAN noted in *Garcia v City of Jackson,* 152 Mich App 254, 264; 393 NW2d 599 (1986), "[i]n practice, the distinction between intentionally tortious conduct and merely negligent conduct is often blurred so that an act otherwise traditionally recognized as negligent conduct is deemed to be intentional."

structure which is a nuisance at all times and under any circumstances, regardless of location or surroundings." [*Rosario, supra,* p 133.]

Since none of the plaintiffs in the cases at bar have claimed a nuisance per se, and since such a claim would be implausible under the facts of these cases, we decline to consider at this time the viability of a nuisance per se exception.

However, we note that three pre-1964 cases are often cited to support the inclusion of nuisances per se within the exception: *Royston v City of Charlotte,* 278 Mich 255; 270 NW 288 (1936), *Trowbridge v City of Lansing,* 237 Mich 402; 212 NW 73 (1927), and *Attorney General ex rel Wyoming Twp v Grand Rapids, supra.* We also observe that two of these cases fall into the category of trespass-nuisance.[15]

In *Trowbridge,* the plaintiffs sought abatement of the city's operation of a "piggery," essentially a site where hogs were kept and fed truckloads of municipal garbage.

The plaintiffs had alleged "physical discomfort from the sickening, nauseating, and offensive odors." In addition, "they were annoyed by flies in great and unusual numbers." Insects and odors may be characterized as intrusions of a trespassory nature. Their presence on the plaintiffs' property constituted a nuisance and was within the control of the municipal defendant.

The same conclusion may be drawn from *Attorney General ex rel Wyoming Twp, supra.* In that case, the defendant city's depositing of sewage in the river was alleged to be a public nuisance by the plaintiff riparian owners. Like the plaintiffs in

---

[15] Both *Trowbridge* and *Wyoming* emphasized the equitable nature of the relief granted. Thus, it is questionable whether these cases should even be cited in the context of governmental immunity. See n 5.

*Trowbridge,* these plaintiffs sought abatement of the alleged nuisance. *Pennoyer, Ashley,* and *Seaman* were cited as controlling precedent (175 Mich 534), and several references to just compensation were made. See *id.,* pp 534, 539. The sewage that was allegedly "cast upon" the plaintiffs' land, *id.,* p 505, was certainly a trespass-nuisance. Thus, both of the activities in *Trowbridge* and *Wyoming,* while capable of being described as nuisances per se, were clearly trespass-nuisance and in line with the exception adopted today. *Royston* has been subject to various interpretations.[16]

Nonetheless, because no nuisance per se is alleged in these cases, we refrain at this time from a complete analysis of these cases. We leave for another day the question whether there is sufficient historical precedent to support a nuisance per se exception.

3

Although the vast majority of cases applying a nuisance exception to governmental immunity prior to the enactment of the governmental tort liability act in 1964 involved classic trespass or intruding nuisance onto private property, there is at least one exception to this rule, *Pound v Garden City School Dist,* 372 Mich 499; 127 NW2d 390 (1964), discussed below. This apparent departure

---

[16] Justice MOODY's opinion in *Gerzeski, supra,* p 159, interpreted *Royston* as excluding only negligence claims from the purview of the exception, thereby leaving the door open to the inclusion of "intentional nuisances. By contrast, Justice RYAN read *Royston* as stating merely that nuisances per se were to be included in the exception. *Id.,* p 168, n 7.

We find that both of these views tend to stretch the import of the *Royston* decision. The *Royston* Court held that the alleged negligent acts fell within the municipality's immunity. In dictum, it indicated that nuisances per se "do not come within the immunity otherwise accorded." *Royston, supra,* p 260. We decline to adopt *Royston's* misstatement of the law.

from precedent involved a public nuisance analogous to trespass-nuisance, but with no private property interest at stake. However, as with nuisance per se, we do not now consider the full import of the *Pound* case.

In *Pound,* the plaintiff was injured on ice created on a public sidewalk by improper drainage from school property. The *Pound* Court applied *Ferris,* quoting extensively from that case, and held that the plaintiff's allegations were within the *Ferris* criterion of " 'a direct injury to the person of the plaintiff, while outside the limits of the defendant's premises.' " *Id.,* p 501.

The *Pound* Court refused to

> establish a distinction between a plaintiff who is directly injured while upon his own premises by the wrongful act of defendant and another plaintiff who is likewise directly injured in a place, such as a public way, where he has a right to be and which is not subject to the authority of defendant. Such a distinction would be without justification in logic or public policy. [*Id.,* p 502.]

Thus, *Pound* might be used as the basis for an argument that a form of public nuisance, which mirrors the trespass-nuisance situation but occurs on public property, should be included within the historically recognized exception.[17] However, we decline to address the question whether such a

---

[17] However, it may also be argued that *Pound* is not within the body of case law that the Legislature intended to incorporate into § 7 of the governmental tort liability act, 1964 PA 170. The original language of the last sentence of § 7 incorporated all immunity from tort liability existing "heretofore, which immunity is hereby affirmed." See n 1. The bill that became 1964 PA 170, SB 1132, was introduced on February 6, 1964, and passed the Senate on March 24, 1964. *Pound* was decided April 6, 1964. Although the House passed the bill with amendments on April 22, 1964, and it was signed by the Governor on May 19, 1964, none of the post-*Pound* amendments related to the "heretofore" language.

limited public nuisance exception has a sufficient historical basis because none of the cases at bar are analogous to *Pound.*

## IV

Applying the nuisance exception to governmental immunity as defined herein, we affirm the decisions of the Court of Appeals in *Hadfield v Oakland Co Drain Comm'r* and in *McCaul v Lake Odessa,* finding the exception applicable. We reverse the decisions of the Court of Appeals in *Veeneman v Michigan* and *Landry v Detroit,* where defendants were denied immunity. There are three additional issues presented in *Hadfield, Veeneman,* and *Landry,* which are discussed in the context of their respective cases.

Three of the four cases at bar resulted in summary judgment, GCR 1963, 117.2(1) (MCR 2.116[C][8]). We note that under this rule the court "does not act as a factfinder, nor does the court attempt to probe the parties' ability to prove their allegations. Thus, the court accepts as true all well-pleaded facts." *Abel v Eli Lilly & Co,* 418 Mich 311, 324; 343 NW2d 164 (1984), reh den 419 Mich 1201 (1984), cert den sub nom *E R Squibb & Sons, Inc v Abel,* 469 US 833 (1984).

### A

*HADFIELD v OAKLAND COUNTY DRAIN COMMISSIONER*

This case arose out of the flooding of plaintiffs' sod farm allegedly caused by the obstruction of the Big Meadows and Paint Creek Drains due to defendants'[18] failure to prevent the installation of cer-

[18] The Department of Natural Resources is no longer a defendant in this case. The trial judge found that plaintiffs had not proved inten-

tain culverts[19] and subsequent failure to remove those culverts.

In 1964, plaintiffs requested permission from the drain commissioner[20] to remove dirt from the drains to keep water from backing onto their land. Plaintiffs introduced evidence that beginning in 1965 they installed "drainage tiles" which, for a period of time, largely or completely eliminated the problem.

However, in 1967, the plaintiffs complained to the drain commissioner about improper functioning of the drains. The plaintiffs' son bulldozed the drains, which improved their functioning until 1969. The plaintiffs complained again in 1969, and again their son cleaned out and bulldozed the drains. In 1973, plaintiffs hired a contractor to clean the drains, but, because of the great quantity of mud in the drains, the contractor was unable to perform the task. Plaintiffs did not petition to have the drain commissioner clean out the drains. See MCL 280.194; MSA 11.1194.

The accumulation of water that began in 1972 took longer to drain off than had the water in previous years. In 1973, the drain commissioner's office discovered the culverts and wrote letters to those who had installed them and contacted the

tional nuisance as to the DNR, and the Court of Appeals affirmed. Plaintiffs-appellants have not appealed that ruling.

[19] The culverts were installed by neighboring landowners. The landowners had informed the Oakland County Drain Commissioner of their intent to install some of the culverts in 1970. However, they were (incorrectly) informed that the drain commissioner lacked jurisdiction over that part of the drain and could do nothing to prevent installation of the culverts as proposed. Eventually, the drain commissioner, in 1976, brought suit against the landowners to have the culverts removed.

[20] The Drain Code, MCL 280.1 *et seq.;* MSA 11.1001 *et seq.,* charges the Oakland County Drain Commissioner with "the responsibility of establishing, inspecting, maintaining, deepening, widening and otherwise controlling the operation and flow of the County drains." The Big Meadows and Paint Creek Drains are within the jurisdiction of the drain commissioner.

DNR to pursue a negotiated removal of the culverts. When this approach failed, the drain commissioner's office, in 1976, sued the landowners who had installed the culverts.

Plaintiffs discovered the culverts in 1975, complained to the drain commissioner, and eventually brought suit in 1977 against the current defendants and the Department of Natural Resources. The complaint contained four counts.

The first count, entitled "Trespass to Lands," alleged that defendants' actions and omissions resulting in the obstructions to the drains caused permanent damage to plaintiffs' land "virtually destroy[ing] the sod farm business . . . ." Plaintiffs alleged that in 1975 and 1976 they had repeatedly requested the defendants to take action regarding the condition of the drains, but that defendants failed to do so. Because of defendants' failures, plaintiffs alleged that

> the waters were obstructed and stopped so as to back up and flow in large quantities across and upon the Plaintiffs' property, trespassing thereupon and inundating the lands of the Plaintiffs' sod farm to a depth of several feet with muddy water, causing the Plaintiffs' sod farm to be inundated and destroying present and future crops, chattels, fixtures and equipment, the land of productivity and the like . . . .

Count II alleged an "unconstitutional taking of land without compensation." Plaintiffs averred that through their acts and failures to act, defendants had

> unjustifiably and unlawfully interfered, hindered, prevented and deprived the Plaintiffs of the use of the lands for the purpose for which they had been used and were intended.

The third count sounded in public nuisance. The plaintiffs alleged

> that the large accumulation of standing water on the Plaintiffs' land constitute[d] a serious health hazard . . . .

Finally, the plaintiffs' fourth count sought mandamus to have the drains immediately removed.

The drain commission disputed its jurisdiction and its failure to fulfill its duties. It did concede that the culverts constituted a blockage. It argued that the blockage did not cause flooding as far up the drain as plaintiffs' farm and that the flooding was instead caused by a combination of heavy rainfall and the marsh-like nature of the land, made apparent by the pre-culvert flooding.

Oakland Circuit Judge Farrell E. Roberts heard testimony in April, May, and June, 1981. Summary judgment was entered as to counts I (trespass) and IV (mandamus). Count II (taking) was dismissed at the completion of proofs on defendants' motion.

Thus, the trial court opinion addressed only count III, public nuisance. The court observed that "there is a judicially created exception to [governmental immunity] where a plaintiff has alleged . . . intentional nuisances." The court noted preliminarily the fact that in its opinion plaintiffs had pled the existence of both public and private nuisance.

However, in regard to the public nuisance claim, the court held that plaintiffs' proofs had failed. The judge stated:

> Plaintiffs have adduced no testimony or evidence which would tend to establish that the Defendants' activities resulted in harm to "an interest common

to the general public, rather than peculiar to one individual, or several." [*Garfield Twp v Young,* 348 Mich 337, 342; 82 NW2d 876 (1957).]

Relying on the definition of private nuisance offered in *Kilts, supra,* Judge Roberts found that plaintiffs had established the existence of a private nuisance created by the defendants.

"In the case at bar, Plaintiffs have introduced evidence that the Defendants' activities in failing to remove the silt from the drains and in allowing the culverts to be installed, have created a condition which exacerbated the flooding problems on the Plaintiffs' farm. Further, the Plaintiffs have adduced evidence that the OCDC allowed this condition to continue after adequate notice of the damages being caused. Additionally, Plaintiffs have shown that the condition created by the Defendants prevented the Plaintiffs from carrying on their sod business as effectively as the terrain permitted. Therefore, this Court finds that Plaintiffs have established the existence of private nuisance created by the Defendants."

The judge then proceeded to determine whether the private nuisance was "intentional," having interpreted *Rosario* as requiring that determination. Employing the test of "knowledge that harm to the plaintiff was 'substantially certain' to follow," see n 14, the judge found that the DNR's actions were not intentional. If anything, the court found them to be negligent, but also found that "upon being notified of these problems the DNR began to take such steps as were permissible . . . to rectify the situation." Thus, even under a negligence standard, the judge appeared to indicate that the DNR would not be liable.

Regarding the defendant drain commission, how-

ever, the court found the requisite intent. The
court noted that although the commission was
aware of the problem as early as 1967, and aware
of the proposed culverts as of 1970, it did not take
steps to remove them until 1976. Thus, plaintiffs
were found to have "demonstrat[ed] the continued
existence of the nuisance after the [drain commis-
sion] 'knew or should have known that harm to
the Plaintiff[s] was substantially certain to
follow.' "

Judge Roberts then addressed the issue of dam-
ages. The plaintiffs had alleged damages of approx-
imately $2,300,000. These damages were composed
of past lost profits, future lost profits until the land
returned to normal, and costs of the cleanup and
replanting. In his findings, the judge stated that
"[d]efendants did not dispute Plaintiffs' evidence
[as to this amount] . . . ."[21]

The judge took a position between the two par-
ties' versions of events. He apparently believed
that culverts exacerbated flooding which would
have occurred anyway due to the nature of the
land and unusually heavy rainfall in 1975, and he
awarded plaintiffs one percent of the damages they
sought.

In response to the defendant drain commission's
motion for judgment notwithstanding the verdict,
or motion to clarify findings of fact and conclu-
sions 'of law, and to plaintiffs' motion for entry of
judgment, taxation of costs and interest and award
of expert fees, the trial judge issued another opin-
ion affirming its earlier findings.

In response to defendants' allegation that it had

---

[21] In their brief, defendants claim they did not admit that the
amounts were accurate, and they did so state at trial. However,
defendants did not introduce evidence contradicting the losses de-
scribed by plaintiffs. The thrust of defendants' case on damages went
to causation; while not disputing plaintiffs' losses due to flooding, they
argued that the placement of the culverts did not cause the flooding.

failed to address the question of causation in regard to its finding of private nuisance, the court quoted from its earlier findings, which "clearly stated that the conduct of the Defendants was the cause in fact of the Plaintiffs' damages."

Regarding its finding of *intentional* nuisance, the court quoted the definition from *Rosario* and reiterated its holding that defendants' negligent acts, combined with their knowledge that harm was substantially certain to follow, amounted to the requisite intent.

The court declined to amend its findings of fact to state that one of defendants' experts had visited the farm. The court noted that such a change would not affect the outcome because of the court's discretion to accord more weight to the plaintiffs' experts than to those of the defendants.

Finally, the court granted in part and denied in part plaintiffs' motion for entry of judgment, taxation of costs and interest, and award of expert fees.

The plaintiffs appealed the damage award without seeking a modification of the award or a new trial from the trial judge. Defendant drain commissioner, and defendants Big Meadows Drain and Paint Creek Drain cross-appealed on the issue of governmental immunity. In an unpublished opinion, the Court of Appeals affirmed the decision of the trial court on both issues.

Regarding application of the "intentional nuisance" exception, the Court found:

> [T]he evidence amply supported a finding that defendants continued the condition causing the nuisance with full knowledge that plaintiffs had sustained considerable property damage and that further injury to plaintiffs' interests was substantially certain to occur. [*Hadfield v Oakland Co Drain Comm'r,* unpublished opinion per curiam of

the Court of Appeals, decided September 20, 1984
(Docket No. 68789).]

The Court concluded that defendants had misread
the trial court opinion and that the lower court
had properly found that defendants had created
and maintained an intentional nuisance.

Regarding the damages issue, the Court, viewing
the appeal as a "great weight of the evidence"
challenge to the amount of the award, rejected
plaintiffs' claim because they had not first moved
for a new trial in the circuit court. Further, the
court held that, absent such a motion, review of
the adequacy of the award is not permitted unless
there was *no* (i.e., insufficient) evidence to support
the verdict.

The Court of Appeals denied plaintiffs' applica-
tion for rehearing, and plaintiffs appealed to this
Court. Defendants cross-appealed. Leave to appeal
was granted. 424 Mich 876 (1986).

1

Regarding the issue of governmental immunity,
we find that the *Hadfield* case represents a clear
example of an actionable trespass-nuisance. The
trial court found that plaintiffs suffered an inter-
ference with the use and enjoyment of their land.
The interference was a physical intrusion onto
private property that was caused by the county
drain commissioner's actions or failure to act.
Thus, it amounted to a trespass-nuisance for which
the county drain commissioner may be held liable.

The *Hadfield* case is directly in line with the
exception as it evolved prior to the enactment of
the governmental tort liability act. The facts of
*Hadfield* are remarkably similar to one of the
earliest nuisance exception cases: *Pennoyer v Sagi-*

*naw, supra,* in which the plaintiff alleged that the city maintained ditches "whereby the surplus surface water of the city is thrown upon the land of the plaintiff, to his great injury." Another early case, *Ashley v Port Huron, supra,* also involved flooding, although, as in *Pennoyer,* the flooding was directly tied to a deliberate act (rather than failure to act) by the defendant. See also *Rice, supra.*

The "direct act" element of trespass-nuisance was weakened over time, however, so that eventually, trespass-nuisances stemming from negligent acts were held to be actionable. The *Seaman* case is directly on point in this regard. In *Seaman,* the defendant city was held liable for its negligence in failing to maintain its drainage system which caused an invasion of water on the plaintiff's property. Likewise, the Court in *Herro, supra,* p 272, described "the common-law right of recovery for destructive water trespass, no matter who the public or private trespasser-flooder might be . . . ."

Thus, under the historical trespass-nuisance exception that is reaffirmed today, we agree with the lower court's determination that the defendant may be held liable for the flooding to the Hadfield farm.

2

The second issue in *Hadfield* relates to the damage award which plaintiffs have appealed.

Defendants claim and the Court of Appeals held that plaintiffs' appeal could not be heard since an appeal arguing that the amount of an award is against the great weight of the evidence can only be considered if preserved by a motion for a new trial made before the trial court.

We believe that the Court of Appeals erred in concluding that the "great weight of the evidence" was the sole basis for plaintiffs' appeal. The Court's error was, however, understandable in light of the lack of clarity and consistency in plaintiffs' brief. Plaintiffs' brief referred to and confused the following four grounds for the appeal: whether the amount of damages awarded by the trial court was against the great weight of the evidence,[22] whether there was insufficient evidence to support the amount of the award,[23] whether the amount of the award constituted clear error,[24] and whether the trial judge failed to base his conclusions as to damages upon sufficient findings of fact regarding causation.[25]

---

[22] [T]he lower court's awarded damages . . . [are] manifestly inadequate and contrary to the great weight of [the] evidence.

[23] [T]he court's findings respecting damages are utterly lacking and [sic] evidential support, and bear no rational relationship to the proofs.

[24] Even if the court is given the benefit of the doubt and one considers any rational view of the record [that] would support the court's damage award, the unexplained use of the formulaic approach in calculating the compensable losses as [sic] clear error.

[25] Since the issue of causation in this action turned upon considerations of tangible matters—such as the size of the drain district, drain depth, volume [of] water passing through the drain, the water table, visual observation of water flow, measurement of obstructions and the consequential silting effects—the assessment of damages should have been made according to assessment of this data. Since the testimony provided this data and, additionally, comprehensive inspections taken at different times during the period in question, by both experts and a layman, the court had ample material to work with. After sifting through the data and judging the opinions formulated after inspections, the court should have applied the conclusions it drew from this assessment against the undis-

Each of these arguments is relevant to appellate review of a trial court's ultimate conclusions. The first three, however, as opposed to the last, require that an appellate court review the evidence and determine, to the degree required by the particular standard of review, whether the trial court's conclusions are consistent with that evidence. The last requires only a determination whether the trial court made adequate findings of fact to explain its ultimate conclusions, and no inquiry into the accuracy of these findings is necessary.[26]

puted estimates of business losses suffered by the Hadfields from year to year. The court should have decided which areas of the farm were actually impacted upon [sic] [by] the nuisance and determine how much of the acreage of sod was actually lost in those areas.

[26] Defendants have focused solely on the proper review of the *accuracy* of the judge's conclusions. They argue that a motion for a new trial is a prerequisite to appellate review under the "great weight of the evidence" standard. For this proposition they cite four cases, all of which involved jury trials: *Davis v Jermstad,* 350 Mich 439; 86 NW2d 316 (1957), *Nadolski v Peters,* 332 Mich 182; 50 NW2d 744 (1952), *Groth v DeGrandchamp,* 71 Mich App 439; 248 NW2d 576 (1976), and *Walls v Transamerica Freight Lines,* 37 Mich App 307; 194 NW2d 422 (1971). Whether this proposition applies to bench trials is questionable.

Underlying the new trial motion requirement is our concern that appellate courts not invade the fact-finding province of a jury. We may not, as such, review a jury's fact finding for error. However, a trial judge's improper denial of a motion for a new trial is an error of law and thus may be reviewed even when that motion was based upon the factual error of a jury.

However, GCR 1963, 517 and GCR 1963, 810 would seem to indicate that in a bench trial the same considerations vis-à-vis the factfinder are not relevant. These rules make clear that, unlike a jury, a trial judge must list the facts upon which he bases his decision and that an appellate court may reverse the judgment whenever any of those findings are clearly erroneous. Thus, a "great weight of the evidence" challenge would seem to be irrelevant in the bench trial setting.

In light of the fact that the trial court failed to make adequate findings of fact, we do not now resolve the parties' apparent confusion concerning the proper form of appeal (i.e., "great weight of the evidence" or "clearly erroneous") and motions necessary to preserve such appeal where the accuracy rather than the adequacy of factual findings in a bench trial is in question. We will, however, consider appropriate administrative action to clarify the relevant rules and procedure.

It is the trial judge's failure to make findings of fact that is dispositive of this issue. GCR 1963, 517.1 states in pertinent part:

> In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment. . . . Requests for findings are not necessary for purposes of review. No exception need be taken to any finding or decision.

Once the existence of a nuisance and defendants' responsibility for it were shown in this case, the critical question became the amount of damage to plaintiffs' land caused by that nuisance. Since defendants admitted that flooding had occurred, but argued that it was caused by factors unrelated to the installation of the culverts, the amount of damages for which defendants were liable could be ascertained only by determining how much of the flooding was caused by the installation of the culverts. The trial court, however, made no attempt to do so.

The trial court's findings as to damages are no more than a summary of the witnesses' testimony and the parties' evidence.[27] The court quite simply

---

Defendants have also argued that the amount of damages is not, as such, a finding of fact and may not, therefore, be reviewed for clear error. We also need not reach this question. However, we observe that the federal courts have consistently held that the size of a damage award is a factual determination based on the evidence and reviewable under the "clearly erroneous" standard. E.g., *Smith v Manausa,* 535 F2d 353, 354 (CA 6, 1976); *Felder v United States,* 543 F2d 657 (CA 9, 1976); *Jacobs v New Orleans,* 484 F2d 24, 25 (CA 5, 1973); *Welch & Carr Construction Corp v Wheeler,* 470 F2d 140, 141 (CA 1, 1972).

[27] The court's introduction to its findings of facts and those findings relevant to causation read as follows:

> This Court, having heard the representations of the parties, having taken testimony and having reviewed the evidence, makes the following findings of fact:

\* \* \*

33. That Glen Hadfield testified on behalf of Plaintiffs. He testified that he had worked on Plaintiffs' farm since graduating from high school. His testimony indicates that commencing in 1972 water accumulated on Plaintiffs' property and took longer than in prior years to drain off.

34. That Delbert Moshier, a sod farmer neighbor of Plaintiffs, testified on behalf of Plaintiffs that the drain near his property was full of silt and not draining properly. He also testified that he had not requested the OCDC to clean the drain but instead had done so himself. He further testified that he continues to farm sod and has not lost any to flooding. Lastly, he testified that the rains were unusually heavy in 1975.

35. That Delton Lohff testified as an expert on Plaintiffs' behalf. Mr. Lohff is a professional engineer employed by Hieft Engineering.

36. That Mr. Lohff visually observed the Hadfield farm, the drains and the culverts in 1975. Mr. Lohff also examined maps of the area including the United States Geological Survey's quadrangle maps. In arriving at his conclusions Mr. Lohff did not take into account rainfall data and did not measure the drainage area or stream flow.

37. That Mr. Lohff's testimony indicates that the Hadfield farm is located on low lying land with a high water table and could loosely be characterized as a flood plain. Mr. Lohff's testimony further indicates that portions of Plaintiffs' farm may be characterized as swampy or wetlands.

38. That Mr. Lohff's testimony indicates that the flooding of the Hadfield farm was caused in part, or exacerbated, by improper maintenance of the drains and the presence of the culverts.

39. That a former owner of a portion of the Hadfield farm testified that flooding occurred on the farm every two or three years. This witness, Mr. Wart, further testified that during the period of his ownership no drain tiles had been installed on the farm.

40. That James Boulton testified on behalf of the DNR. Mr. Boulton is employed by the DNR as its Flood Hazard Management Chief. Mr. Boulton is a licensed professional engineer with a degree in civil engineering from the University of Michigan.

41. That Mr. Boulton did not visit the Hadfield farm in preparing his findings. Mr. Boulton relied on field surveys submitted by consulting engineers in a subdivision development along the Big Meadow and Paint Creek [D]rains. Mr. Boulton further relied on field surveys submitted to him by the OCDC.

42. That Mr. Boulton characterized the Hadfield farm as swampy or a wetland and stated that the area could be characterizes [sic] as a flood plain.

43. That Mr. Boulton further testified that the most severe

failed to express its own view as to this evidence or a factual basis for the damages awarded. A mere recitation of the parties' claims without findings as to which claims are true or in part true is insufficient. *Patrons' Mutual Fire Ins Co v Goodman,* 202 Mich 66; 167 NW2d 955 (1918); *Powell v Collias,* 59 Mich App 709; 229 NW2d 897 (1975). Instead,

> [t]he findings must disclose the basis for each ultimate fact necessary to sustain the court's conclusions of law.

\* \* \*

flooding occurs when water rises up to but not over a culvert. He stated that this would increase the water level upstream at Ramsey Road by nine inches but that the water would not overflow the banks onto the land. He further stated that as the drain proceeded further into the Hadfield farm the water level would diminish and the impact on the farm would be minimal.

44. That in Mr. Boulton's opinion the flooding of the Hadfield farm was not due to the installation of the culverts.

45. That David Snyder testified on behalf of Defendant OCDC. Mr. Snyder is an employee of the OCDC. Mr. Snyder testified as to the circumstances surrounding the farmers' application for the culverts. He also testified that the Hadfield farm contains a wooded swampy area.

46. That Bob Fredericks testified on behalf of the Defendant OCDC. Mr. Fredericks testified as to the OCDC's use of welfare crews to maintain the drain. Mr. Fredericks also testified as to the availability of funds to maintain and repair the drains.

47. That Plaintiffs called in rebuttal a Mr. McCoy. Mr. McCoy is a non-degreed registered land surveyor.

48. That Mr. McCoy arrived at his findings by use of survey maps, by making cross sections of the area after actually walking the drains and then compiling the data on longitudinal drawings.

49. That Mr. McCoy's findings indicate that the culverts impinge upon the flow of water adjacent to Plaintiffs' farm. Mr. McCoy further testified that there is a natural fall in the drainage system which allows water to drain off the Hadfield farm. Lastly, Mr. McCoy testified that the drains were clogged with silt.

50. That the Defendant introduced exhibits which indicate that unusually heavy rains fell in the area of the Hadfield farm in 1975.

The findings of fact must include as much of the subsidiary facts as is necessary to disclose the steps by which the trial court reached its ultimate conclusion on each factual issue. The findings should be made at a level of specificity which will disclose to the reviewing court the choices made as between competing factual premises at the critical point that controls the ultimate conclusion of fact. That is, at the point where a given choice as to the concrete facts leads inevitably to the ultimate conclusion, the findings should disclose the choice which was made . . . . [2 Honigman & Hawkins, Michigan Court Rules Annotated (2d ed), p 594.]

The trial judge's ultimate conclusions as to damages in this case read as follows:

This Court finds that while flooding occurred at the Hadfield farm prior to the creation of the nuisance, the nuisance increased or exacerbated the problem. . . . [T]his Court was not provided with exact measurements with regard to the aggravation of the flooding of the Plaintiffs' farm. However, based on [sic] this Court's evaluation of the evidence and the demeanor of the witnesses, this Court finds that on one-hundreth [sic] (1/100) of the damages claimed would provide reasonable compensation for the aggravation of Plaintiffs' flooding problems.

Plaintiffs estimate that the damages to their farm over the years amounts to between Two Million, One Hundred Seventeen Thousand, One Hundred Eighty-eight and No/100 ($2,117,188.00) Dollars and Two Million, Three Hundred Thirty-two Thousand, One Hundred Eighty-eight and No/100 ($2,332,188.00) Dollars. As the Defendants did not dispute Plaintiffs' evidence, this Court will accept the higher figure. Thus, applying our formula, Plaintiffs are entitled to one one-hundredth (1/100) of the higher estimate, or Twenty-three Thousand, Three Hundred Twenty-one and 88/100 ($23,321.88) Dollars.

Obviously, the trial judge believed that the flooding was in part due to the installation of the culverts and in part due to other causes. However, he failed to make any factual findings to support his one-percent formula. See n 26. To the contrary, the one-percent formula seems to have been wholly arbitrary and is precisely the type of unsupported conclusion that GCR 1963, 517.1 was designed to prevent. An unadorned citation to "the evidence and the demeanor of the witnesses" does not begin to accomplish the purposes of the rule.

In sum, we hold that a prior review by the trial court is not necessary to preserve for appeal the question whether the trial court made findings of fact pursuant to GCR 1963, 517.1. Accordingly, we remand this case to the circuit court for further and more specific findings of fact, a damage award based upon those findings, and, if necessary, the taking of further evidence on the question of the amount of damage resulting from defendants' actions or failure to act.

B

*VEENEMAN v MICHIGAN*

Plaintiff's decedent was fatally injured in a dune buggy accident on May 23, 1981. The dune buggy overturned in the Silver Lake State Park, Oceana County, within an area designated for use by off-road vehicles.

Plaintiff brought this wrongful death action in March, 1982, against the State of Michigan,[28] alleging negligence stemming in part from defendant's alleged failure to inspect vehicles, to regulate the operation of the off-road vehicles in various ways,

---

[28] Plaintiff had brought a second action against Appletree Automotive, Inc., which was consolidated in the circuit court. Appletree is not a party to this appeal.

and to provide adequate medical personnel. Plaintiff's first amended complaint, filed in September, 1982, added a count in nuisance, based on allegations of nuisance in fact, and a count alleging that defendant's activities amounted to a proprietary function. The nuisance-in-fact claim was based also on allegations that defendant improperly regulated off-road vehicles and that "[d]efendant was aware of previous deaths and injuries of a similar nature in the area, but failed to correct the problem."

On May 2, 1983, Judge Terrence R. Thomas granted defendant's motion for summary judgment under GCR 1963, 117.2(1). The court held the action barred by governmental immunity and the recreational user statute, MCL 300.201; MSA 13.1485.

The trial court found

that the State's interest relative to this matter is providing a public parkway consistent with both the general statute concerning governmental immunity together with the mandatory provisions of the other statute of off-road vehicle areas . . . are such that the State would be entitled to the protections of the doctrine of governmental immunity . . . .

The court also granted plaintiff's motion to amend its complaint.

Plaintiff's second amended complaint added an intentional nuisance count, a negligent nuisance count, as well as one sounding in gross negligence or wilful and wanton misconduct. The intentional nuisance claim was a restatement of the previous nuisance claim, under a new title.

Judge Thomas entered a final order of dismissal after granting defendant's motion for summary judgment on June 6, 1983. Plaintiff appealed, and

the Court of Appeals affirmed in part and reversed in part.

The Court of Appeals held that the action was barred by governmental immunity *except* as to plaintiff's allegation of intentional nuisance and that the action was not barred by the recreational user act. Judge KELLY dissented from the Court's finding that plaintiff had sufficiently pled intentional nuisance.

The Court stated the rule from Justice MOODY's opinions in *Rosario* and *Gerzeski* regarding the definition of intentional nuisance. See n 14. The Court held that plaintiff's allegations of negligence, combined with his allegation

> that defendant was aware of previous deaths and injuries of a similar nature in the area, and knowing this, failed to take appropriate measures[,] [143 Mich App 694, 701; 373 NW2d 193 (1985),]

constituted a sufficient allegation of intentional nuisance.

The Court also accepted plaintiff's arguments under the recreational user act, finding no bar to the suit.

In his dissenting opinion, Judge KELLY focused on the fact that plaintiff's complaint had alleged only omissive acts on the part of defendant. He would have held that " 'acts of omission rather than commission are not generally characterized as intentional torts.' " *Id.,* p 703 (citations omitted).

Accepting as true the facts pleaded by the plaintiff in *Veeneman,* we find that there is no basis for holding the state liable under the trespass-nuisance exception to governmental immunity that is described herein. There are no allegations of trespassory or intruding nuisance and no facts that would support such an allegation. In addition, the

facts as alleged in *Veeneman* do not amount to a nuisance per se, nor are they at all analogous to the *Pound* case. Thus, it is unnecessary to consider the possible applicability of either a nuisance per se exception or a limited public nuisance exception such as that described above. Therefore, we reverse the decision of the Court of Appeals and reinstate the order of dismissal based on the grant of defendant's motion for summary judgment.

Because we find that this suit is barred by governmental immunity, it is unnecessary to address the issues raised relative to the recreational user act.

C

*LANDRY v DETROIT*

The Court of Appeals has succinctly stated the facts in this case:

> Plaintiffs brought suit against defendant City of Detroit and defendant Detroit Wayne Joint Building Authority seeking to recover for personal injuries. Plaintiffs alleged that on December 18, 1981, they were present in Recorder's Court, located in the Frank Murphy Hall of Justice in the City of Detroit. Plaintiffs were in court for the purpose of testifying against Rosie Fleming. Plaintiffs alleged that they sustained serious injuries when Fleming attacked them with a knife in the courtroom. Plaintiffs averred that their injuries, which included stab wounds, internal injuries, partial paralysis, breathing impairment, and permanent scarring, were proximately caused by defendants' inadequate provisions for security in the courthouse. Plaintiffs' complaint alleged negligence, breach of contract and nuisance. [*Landry v Detroit*, 143 Mich App 16, 19; 371 NW2d 466 (1985).]

Several aspects of plaintiffs' complaint are most

relevant to the two issues of this appeal. Plaintiffs have based their claim of liability both on the common-law nuisance exception and the statutory public-buildings exception to governmental immunity, MCL 691.1406; MSA 3.996(106). In count I, plaintiffs alleged, inter alia, "that the injuries hereinafter described were a direct result of a dangerous and/or defective condition existing within a public building under the care, control, maintenance and jurisdiction of the Defendants." We do not reach the substance of this second issue for the reasons indicated below.

Count II of plaintiffs' second amended complaint alleged negligent nuisance and intentional nuisance. Plaintiffs alleged defendants' knowledge of the presence of dangerous persons, of the fact that other courthouses employ security measures such as metal detectors, and that metal detectors "were supposed to be installed to adequately protect the public, but said metal detectors were not installed in time." Plaintiffs further alleged that defendants had caused a deceptive appearance of safety to exist in the court building through the stationing of inadequate personnel to provide safety to the plaintiffs.

Defendants moved for summary judgment under GCR 1963, 117.2(1), claiming governmental immunity. The trial court dismissed the complaint after granting defendants' motion. The court articulated no basis for its ruling on the record.

Plaintiffs appealed the summary judgment ruling in the Court of Appeals, which affirmed in part and reversed in part in a split decision. The majority found that summary judgment was inappropriately applied to the intentional nuisance claim, but affirmed the disposition of all other claims. Judge M. J. KELLY dissented; he found insufficient allegations of intentional nuisance, but would have

allowed the public-buildings exception claim to go to trial.

The majority first addressed the implied contract claim, not at issue here, and held that plaintiffs had "fail[ed] to identify facts which could constitute an offer, acceptance, consideration, reliance or other facts which would give rise to the inference that a contract existed." *Id.,* p 21.

Plaintiffs' pleadings regarding the public-buildings exception[29] were also found to be deficient. The Court of Appeals majority observed:

> [P]laintiffs do not allege that their injuries were sustained from a structural part of the building or a fixture attached thereto. *Zawadzki v Taylor,* 70 Mich App 545, 551; 246 NW2d 161 (1976), lv den 399 Mich 875 (1977). Plaintiffs do not allege that the courtroom was being used in a manner for which it was not intended. Unlike in the cases cited by plaintiffs, *Bush* [*v Oscoda Area Schools,* 405 Mich 716; 275 NW2d 268 (1979)], and *Lockaby v Wayne County,* 406 Mich 65; 276 NW2d 1 (1979), the courtroom in the present case was being used as expected, as a courtroom. Plaintiffs' allegations concerning the defective or dangerous condition of Recorder's Court stem not from the condition of the building itself but from the activities or operations conducted within the building. Consequently, plaintiffs have not stated a claim within the public-buildings exception. *Vargo v Svitchan,* 100

---

[29] MCL 691.1406; MSA 3.996(106) provides in part:

Governmental agencies have the obligation to repair and maintain public buildings under their control when open for use by members of the public. Governmental agencies are liable for bodily injury and property damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.

Mich App 809, 822-823; 301 NW2d 1 (1980), app dis
411 Mich 1035[, 1036] (1982). [*Id.,* p 22.][30]

However, the Court found the intentional nui-
sance allegations to be sufficient. Regarding plain-
tiffs' pleading of a nuisance cause of action, the
majority quoted the definition of nuisance from
*Buckeye, supra.* It noted the facts of *Buckeye,*
specifically observing that the nuisance in that
case was a building found to be a fire hazard and
"readily    accessible    to    vandals    and
trespassers . . . ." *Landry, supra,* p 23. The Court
held that allegations of omissive acts do not auto-
matically convert a claim of nuisance into a negli-
gence claim. Regarding defendants' argument that
they lacked control over the courtroom, the major-
ity noted that the issue raised questions of fact
that could not be considered on review of a sum-
mary judgment.

On the issue of intent, the majority applied the
test that requires an "inten[t] to bring about condi-
tions which are found to be a nuisance," *Rosario,
supra,* p 142 (MOODY, J.), and concluded:

> Plaintiffs' allegation, that defendants refused to
> take necessary safety measures, pleads a deliber-
> ate act by the governmental agency to create the
> condition. *Rosario,* p 143. Plaintiffs' allegations of
> a dangerous condition are based on the fact that
> dangerous persons are brought together with their
> accusers in the same building. A trier of fact could
> conclude, under those circumstances, that the ab-

---

[30] Judge KELLY, dissenting with regard to this issue, would have
found that

plaintiffs [had] alleged facts which, if believed, would allow
reasonable minds to conclude that the absence of metal detec-
tor devices in the Frank Murphy Hall of Justice created a
dangerous public building in which to conduct criminal prose-
cutions. [*Id.,* p 28.]

sence of safety devices such as metal detectors
created a dangerous condition which constituted a
nuisance in fact. [*Landry, supra,* p 25.]

Defendants' motion for rehearing in the Court of
Appeals was denied. Defendants appealed to this
Court and leave was granted. 424 Mich 876 (1986).
Plaintiffs did not cross-appeal the public-buildings
exception issue.

1

It is obvious that this case does not fall within
the trespass-nuisance exception that is reaffirmed
today. It may even be questionable whether a
nuisance is present on these facts at all, but
certainly there was no trespass or intruding nui-
sance. There was no allegation of physical invasion
of private property, nor was there alleged interfer-
ence with the use or enjoyment of land. Moreover,
although occurring on public property, the case is
not at all analogous to *Pound,* since the incident
occurred on the defendants' property. See discus-
sion of *Pound, ante,* pp 176–177. There has been no
allegation of a nuisance per se, nor is one plausi-
ble. Thus, summary judgment on this issue was
appropriate, and we reverse the holding of the
Court of Appeals.

2

The public-buildings exception presents a closer
question. However, we do not address it today
because it was not properly appealed.

Defendants appealed, and their brief discussed,
only the nuisance-exception issue. Plaintiffs' brief
responded to defendants' arguments as to nui-
sance, but also argued that the trial court erred in
granting summary judgment, maintaining that the
public-buildings exception applied. Defendants

then filed a reply brief answering plaintiffs' public-buildings exception arguments.[31]
MCR 7.302(F)(4)(a) states:

> Unless otherwise ordered by the Court, appeals shall be limited to the issues raised in the application for leave to appeal.

As we noted in *Peisner v Detroit Free Press*, 421 Mich 125, 129, n 5; 364 NW2d 600 (1984):

> Our appellate procedure is designed to focus the issues on appeal and provide the parties with an opportunity to fully brief and argue *those* issues. This purpose is frustrated by the injection of new issues in the answering brief. Appellees wishing to challenge rulings adverse to them should do so directly by way of a cross-appeal.[32]

### D

### *McCAUL v LAKE ODESSA*

The facts of this case are as presented by the Court of Appeals:

> Plaintiffs Burton E. and Doris R. McCaul are

[31] Defendants' reply brief did not point out that plaintiffs had failed to cross-appeal. In addition, at the outset of oral argument, counsel for defendants stated that the *two* issues before the Court were nuisance and the public-buildings exception. However, since this situation involves the *Court's* decision to grant leave to appeal this issue, defendants may not be said to have "waived" exclusion of it, thereby requiring the Court to consider it.

[32] Plaintiffs might have asked the Court to add the issue pursuant to MCR 7.302(F)(4)(b), which reads in pertinent part:

> On motion of any party, for good cause, the Court may grant a request to add additional issues not raised in the application for leave to appeal or in the order granting leave to appeal.

However, plaintiff did not so move.

owners of farmland located in Odessa Township,
Ionia County. During 1970 and 1971 a sewage
treatment plant was designed by Gove Associates,
Inc., and built by Leach Construction on land
immediately adjacent to the eastern boundary of
plaintiffs' farm. The plant was put into operation
in 1971 by the Village of Lake Odessa to recycle
and treat Lake Odessa's municipal wastewater. On
several occasions raw or partially treated sewage
water flowed from the plant onto plaintiffs' land.

In 1973 plaintiffs and another landowner near
the plant jointly filed suit for damages resulting
from the flow of sewage water onto their lands. A
settlement was entered into on August 13, 1974;
plaintiffs received $7,500 and a release was given
to the Village of Lake Odessa, Gove Associates,
and Leach Construction. The suit was dismissed
with prejudice.

On November 9, 1981, plaintiffs initiated this
lawsuit against the Village of Lake Odessa, Gove
Associates and Leach Construction. Plaintiffs al-
leged that sewage water was released onto plain-
tiffs' land during 1978 and thereafter, causing
damage. Defendants moved for accelerated judg-
ment under GCR 1963, 116.1(5) on the ground that
plaintiffs' action was barred by the 1974 settle-
ment and release. On July 6, 1982, the circuit
court granted defendants' motion. Plaintiffs ap-
pealed to this Court which, in an unpublished per
curiam opinion issued October 31, 1983, reversed
the trial court's grant of accelerated judgment to
the Village of Lake Odessa. Accelerated judgment
in favor of Gove Associates and Leach Construc-
tion was affirmed. The case was remanded to
circuit court where discovery was taken, and a
trial date was set for January 19, 1985.

On January 22, 1985, the Michigan Supreme
Court issued its opinion in *Ross v Consumers
Power Co, supra.* On January 28, 1985, the Village
of Lake Odessa filed a motion for summary judg-
ment pursuant to GCR 1963, 117.2(1), asserting
that plaintiffs' claims were barred by governmen-
tal immunity under the newly enunciated guide-

lines of *Ross.* At a January 29, 1985 hearing on this motion, the circuit court, after observing that the *Ross* holding redefined the terms on which governmental immunity for tort liability is granted and the reasons for that immunity, held that plaintiffs' negligence claim was barred by governmental immunity. The court did not reach the question of whether *Ross* also barred plaintiffs' nuisance claim. Instead, the court held that plaintiffs had pled only ordinary nuisance, not intentional nuisance. Summary judgment was therefore granted to defendant.[1]

---

[1] Third-party defendants Gove Associates, Inc. and J. Leach Construction, Inc., have been dismissed from this appeal upon the stipulation of the parties.

---

[*McCaul v Lake Odessa,* unpublished opinion per curiam of the Court of Appeals, decided February 13, 1986 (Docket No. 83172).]

The Court of Appeals identified the questions presented as whether the nuisance exception survived *Ross* and whether plaintiffs McCaul sufficiently pled intentional nuisance. The panel refused to consider count I of plaintiffs' complaint, in which plaintiffs had alleged an unconstitutional taking, because the issue was raised for the first time on appeal.

The Court first upheld the viability of the nuisance exception, noting that recent Court of Appeals cases had expressly held that the exception had survived *Ross.*

Regarding the issue of intentional nuisance, the Court stated that the plaintiffs must allege nuisance as well as intent. Applying the definition from *Buckeye* ("nuisance is a condition"), the panel held that plaintiffs had sufficiently alleged nuisance. "Plaintiffs' complaint clearly alleges a hazardous and offensive condition. Paragraph 8 states that raw or partially treated sewage water

was allowed from time to time to flow onto plaintiffs' abutting lands."

Regarding intent, the Court held that under any test of intent, plaintiffs had met the standard. The Court quoted from paragraph 9 of plaintiffs' complaint as support for its finding of intent:

"The plaintiffs have repeatedly informed the Village of Lake Odessa of each of these occurrences of flow of sewage, but the Village has taken no action to remedy or stop the flow or to prevent further incidents of this nature."

Therefore, the Court of Appeals reversed the trial court's grant of summary judgment, finding that plaintiffs had sufficiently pled intentional nuisance. Defendant appealed, and leave was granted. 425 Mich 879 (1986).

Applying the standard of review applicable to summary judgment motions under GCR 1963, 117.2(1), it is apparent that this case, like *Hadfield,* conforms to the requirements of the trespass-nuisance exception. Thus, we affirm the Court of Appeals finding that summary judgment was inappropriate.

Whether there are sufficient allegations of the existence of a nuisance or of defendant's control over the creation of the nuisance are not in dispute here. The only questions are whether the exception exists and whether plaintiffs' complaint, read as true, states a claim that conforms to the exception.

Superficially, the facts are directly analogous to the early flooding and sewage cases discussed above to which the trespass-nuisance exception was applied. See *Pennoyer, Ashley, Rice, Seaman,* and *Herro.* We have noted that an analogous case, *Attorney General ex rel Wyoming Twp,* although

characterized as an example of nuisance per se, see *Gerzeski, supra* (opinion of RYAN, J.), also conformed to the requirements of a trespass-nuisance. In that case, sewage was also allegedly "cast upon" plaintiffs' land.

As in *Hadfield,* plaintiffs' allegations regarding trespass and unconstitutional taking establish the existence of trespass-nuisance. The McCauls alleged that the wastewater-treatment facility is adjacent to their property and that the defendants "caused or allowed raw partially treated sewage water to flow from the . . . system onto the lands of the plaintiffs . . . ." The "flow of sewage" allegedly caused: contamination of their well and crops; death of animals; loss of production; and loss of health and vigor among their dairy herd, as well as flooding, obnoxious smells, and health effects to the McCaul family. In their nuisance count, plaintiffs averred that the actions of the village "constitute an interference with the use and enjoyment of the plaintiffs' property . . . ."

Plaintiffs have set forth sufficient allegations of a trespass-nuisance to avoid defendant's assertion of governmental immunity. The Court of Appeals decision is affirmed, and the case remanded for trial in accordance with this opinion.

RILEY, C.J., and CAVANAGH, J., concurred with BRICKLEY, J.

BOYLE, J. (*concurring*). The basic premise of the lead opinion is that § 7 of the governmental tort liability act requires a continuation of the nuisance exception as formulated prior to its enactment in 1964 and as amended by 1970 PA 155. I agree that the Legislature intended to codify the common law of governmental immunity, and I agree with the resolution of each of these cases. I

write separately to observe that as it is not neces-
sary in this case to decide what the common law
includes beyond points necessary for decision, it is
unnecessary to conclude that the common-law nui-
sance exception includes only those theories ex-
pressly necessary to a prior Michigan decision. I
also write because I believe that the opinion's
emphasis on the Taking Clause implicitly suggests
the demise of other potentially viable claims.

The lead opinion is correct that the traditional
trespass-nuisance theory is well recognized as an
exception to governmental immunity in Michigan
case law. The trespass-nuisance theory is simply
the private nuisance recognized at common law.

The lead opinion further notes the category of
public nuisance in Michigan which is governed by
statute as well as common law, and for which a
remedy is abatement. The lead opinion would
limit, however, any private remedy for public nui-
sance to that which is sought for an invasion
which is directly analogous to trespass nuisance. I
disagree that such a limitation is required by the
common law.

I

The law of nuisance may be an "impenetrable
jungle," but the commentators are in agreement
that, historically, nuisance has been limited to the
invasion of two distinct interests.

> One of these two fields of liability bears the
> name of public or common nuisance. It covers the
> invasion of public rights, which is to say, rights
> common to all members of the public, such as for
> example the right to the free and safe use of the
> public highway. In its origin it was criminal, and
> it remained exclusively criminal until the six-
> teenth century, when as an incidental remedy tort

damages were first awarded to private individuals who could show that they had suffered particular harm, distinct from that suffered by other members of the public in general. The limitations thus imposed still have significance today. A public nuisance is still normally a criminal offense . . . , and recovery of damages is still limited to those who can show particular harm, of a kind different from that suffered by other members of the public exercising the public right. . . .

The other field of liability is called private nuisance. It covers the invasion of the private interest in the use and enjoyment of land. In its origin it was purely tortious in character, and it has remained so. It is always a tort against land, and the plaintiff's action must always be founded upon his interest in the land. [4 Restatement Torts, 2d, Introductory Note to ch 40, pp 84-85. See also Prosser & Keeton, Torts (5th ed), § 86, pp 618-619.]

In *Kilts v Kent Co Bd of Supervisors,* 162 Mich 646, 651; 127 NW 821 (1910), this Court described a nuisance as follows:

[A] nuisance involves, not only a defect, but threatening or impending danger to the public, or, if a private nuisance, to the property rights or health of persons sustaining peculiar relations to the same . . . . While adjudicated cases have been so variable that courts generally regard a technical and comprehensive definition difficult if not impracticable, the trend of opinion seems to be that the circumstances must be examined with a view to ascertaining whether the alleged condition is one so serious as to interfere with the comfort of life and enjoyment of property, or so threatening as to constitute an impending danger to persons in the enjoyment of their legitimate rights.

Prior to 1964, this Court had occasion to declare a public nuisance created by the state and to order its abatement. *Attorney General ex rel Wyoming*

*Twp v Grand Rapids,* 175 Mich 503; 141 NW 890 (1913) (disposing of raw sewage in a river); *Trowbridge v City of Lansing,* 237 Mich 402; 212 NW 73 (1927) (decaying garbage in a "piggery"). In both of these cases, the interference was not only with the property and personal rights of the persons affected, but also with the rights of a large community of people.

Presumably, this Court, after recognizing the remedy of abatement against the government for a public nuisance, would not deprive a private individual who suffered special harm because of the same nuisance from a remedy well established at common law. It should follow that the public nuisance remedy, even where not based on invasion of another's property rights, is an exception to governmental immunity.

A nuisance per se is also an exception to governmental immunity. Nuisance per se is but a category of proof which may establish an invasion of public or private rights. Nuisance per se or at law is defined in Michigan as an activity or condition which constitutes a nuisance without regard to the care with which it is conducted or the circumstances under which it exists. *Bluemer v Saginaw Central Oil & Gas Service, Inc,* 356 Mich 399, 411; 97 NW2d 90 (1959).

It is distinguished from the nuisance per accidens or nuisance in fact which is a condition which becomes a nuisance by reason of circumstances and surroundings, and liability is predicated on negligence. *Id.* See also DeMars, *Intentional nuisance in fact: Should it be a bar to a governmental function defense in Michigan?,* 1981 Det C L R 771, 773.

As the lead opinion indicates, the cases of *Royston v City of Charlotte,* 278 Mich 255; 270 NW 288 (1936), *Trowbridge,* and *Attorney General ex*

*rel Wyoming Twp* are often cited to support the inclusion of nuisance per se within the exception. I agree with the lead opinion that the refuse from the piggery in *Trowbridge* and the sewage in *Wyoming* were conditions falling within the nuisance per se category. I also agree that had the claim been made, which it was not, both activities could amount to trespass-nuisance in the invasion of the use and enjoyment of private property. *Royston* is also support for a claim of damages resulting from a nuisance per se. A nuisance per se constituting a public nuisance arises from inherent danger even under the best of care. The statement that a nuisance is "per se" means only that it does not arise out of negligent conduct. Prosser, Torts (4th ed), § 88, p 582.

In other words, unlike the nuisance in fact, nuisance per se is not predicated on the want of care, but is unreasonable by its very nature. Accordingly, "[i]n the few instances wherein the Legislature or this Court may label a condition or activity patently unreasonable by its very nature, the state may not circumvent its liability in connection with the situation or operation by raising the shield of sovereign immunity." *Gerzeski v State Hwy Dep't,* 403 Mich 149, 169; 268 NW2d 525 (1978) (RYAN, J., dissenting). To hold otherwise, would allow the state an absolute right to use its property in any manner it may choose without regard for the public at large or private persons. *Id.*

Therefore, while I concur in the result, and much of the analysis, I respectfully disagree, as indicated.

II

I agree with the lead opinion's dispositions of

*Hadfield v Oakland Co Drain Comm'r* and *McCaul v Village of Lake Odessa* which hold that the defendants may be held liable for the harm to the respective plaintiffs' property on the basis of the trespass-nuisance or private nuisance theory.

I further agree that the Court of Appeals decision in *Veeneman v Michigan* must be reversed as far as it recognizes an intentional nuisance exception to governmental immunity on the basis of the facts of the case. Further, it is clear in that case that plaintiffs cannot sustain either a private nuisance or public nuisance on the basis of the facts of the case. For the same reasons, I agree that the Court of Appeals decision in *Landry v Detroit* must be reversed.

LEVIN, J. (*separate opinion*). I agree with my colleagues that an action for nuisance may be maintained in *Hadfield* against the Oakland County Drain Commissioner and in *McCaul* against the Village of Lake Odessa. The lead opinion reviews the authorities that establish that there is a nuisance exception that survived the enactment of the governmental tort liability act,[1] at least in a case where, as set forth in the lead opinion, there is a "trespass or interference with the use or enjoyment of land caused by a physical intrusion that is set in motion by the government or its agents and resulting in personal or property damage."[2] The plaintiffs in *Hadfield* and *McCaul* alleged such trespass or interference.

I agree with Justice BOYLE that the governmental tort liability act does not preclude a damage action for loss caused by a public nuisance or a nuisance per se, but that neither a private nuisance nor a public nuisance action may be main-

[1] 1964 PA 170, MCL 691.1401; MSA 3.996(101).

[2] *Ante,* p 169.

tained "on the basis of the facts"[3] in *Veeneman* and *Landry.*

Because a majority of the Court agrees that nuisance actions cannot be maintained in *Veeneman* and *Landry,* disposition of the instant cases does not require that we decide whether this Court erred in holding that an action for nuisance may be maintained on the facts of *Rosario v City of Lansing,* 403 Mich 124; 268 NW2d 230 (1978), and *Gerzeski v Dep't of State Hwys,* 403 Mich 149; 268 NW2d 525 (1978).[4]

In *Rosario,* a majority of the Court concluded that the negligent maintenance of a drain by a city resulting in the death of a child was an actionable nuisance.[5] In *Gerzeski, supra* at 162, a

---

[3] *Ante,* p 209.

[4] While this Court, in granting leave to appeal, sought to more fully define the nuisance exception, the basis of disposition in *Veeneman* and *Landry* appears to be—without regard to whether the owner of the property is a government or private person—that there is no tort liability. The result in those cases would probably be the same if, in *Veeneman,* a private person owned the sand dunes and charged a fee for admittance or if, in *Landry,* the government had privatized the operation of the courthouse.

[5] Although no opinion was signed by four justices without qualification in *Rosario* and *Gerzeski,* a majority of the Court ruled that a public nuisance action could be maintained as an exception to the governmental tort liability act for damages suffered on governmental property resulting from a condition of the property, thereby finding that recovery was not limited to losses caused by activities emanating from governmental property that impinge on the use of plaintiff's property. *Rosario v City of Lansing,* 403 Mich 124; 268 NW2d 230 (1978) (FITZGERALD, J.).

The Restatement states that where "the pollution prevents the use of a *public bathing beach* or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance." 4 Restatement Torts, 2d, § 821B, comment g, p 92 (emphasis supplied).

The Restatement also states that while at an earlier stage in the development of the law of nuisance, only conduct constituting a criminal offense was a public nuisance, it is now clearly established "that a defendant need not be subject to criminal responsibility. Thus a municipal corporation, which cannot be prosecuted for a crime, may still be liable in tort for the creation or maintenance of a public nuisance if the conduct is such that a private individual would be liable." 4 Restatement Torts, 2d, § 821B, comment d, p 89.

majority concluded that a nuisance action could be maintained where persons drowned in a frozen artificial pond created and owned by the Department of State Highways. Two of the five-justice majority stated that the trial judge could, on the evidence, properly find that the state had created an intentional nuisance because it "intentionally constructed the pond in the path of a warm water flow" and "[t]his directly resulted in the pond's deceptive appearance and, in a sense, created a trap for those crossing its surface."[6]

In contrast with *Gerzeski,* it does not appear that in *Veeneman* the state failed to guard against a risk that would not have been apparent to a person using the sand dunes for recreational purposes. Ponds, lakes, or sand dunes are not ordinarily public nuisances in their natural condition, unless there is a trap, such as the warm water that converted the ice pond in *Gerzeski* into a

[6] The other three justices constituting the five-justice majority wrote separately to express the view that the nuisance exception to governmental immunity should not be limited to cases where the judge determines that the conduct giving rise to the nuisance was intentional, stating that while the trial judge in that case had accurately determined that the conduct giving rise to the nuisance was intentional, that determination was not necessary for a finding of governmental liability.

While in *Smith v Dep't of Public Health,* 428 Mich 540, 544; 410 NW2d 749 (1987), the majority of this Court held that there "is no 'intentional tort' exception to governmental immunity," it does not follow that in deciding whether a damage action may be maintained for public nuisance, no significance should be attached to whether the government intentionally or merely negligently maintained the condition that gave rise to the loss. 4 Restatement Torts, 2d, § 821B, p 87, defines a public nuisance as "an *unreasonable* interference with a right common to the general public."

The lead opinion states that the trespass exception is constitutionally rooted, but it does not consider whether the constitution protects against physical injury intentionally caused by the state. In an appropriate case, the Court should consider whether the constitution, which bars the state from taking one's property without just compensation, protects against the state disabling a person from enjoying his property by intentionally causing him injury or death. Compare *Thomas v Dep't of State Hwys,* 398 Mich 1; 247 NW2d 530 (1976) (LEVIN, J., concurring).

trap, just as quicksand could create a trap in sand dunes.[7] Failure to warn that sand dunes can tip over a dune buggy in the same way that waves might tip over a boat does not render a natural condition a nuisance.

Similarly, in *Landry*, again in contrast with *Gerzeski*, there was no deceptive appearance or trap. The risk that a defendant in a criminal case[8] may attack another person in a courthouse, particularly one with whom the attacker has a grievance,[9] is apparent. An apparent risk of physical assault is implicit in that situation and is much like the risk that a sand dune buggy or canoe will tip over.

A public nuisance has been defined as "an unreasonable interference with a right common to the general public."[10] Failing to warn recreational users of an apparent risk associated with the use of sand dunes in their natural state is not an unreasonable interference with their right to use the sand dunes. A courthouse is frequently crowded by an assemblage of lawyers, judges, court personnel, victims, defendants, witnesses, their families, media representatives, and the public at large. Failing to warn persons encouraged or even required to be in the courthouse of the apparent danger of physical assault or to guard against that risk[11] is not an unreasonable interference with a

[7] The risk that ice might not be thick enough to support a skater's weight is ordinarily apparent, but not on the facts of *Gerzeski* where, as stated in the controlling opinion, "[t]he state was held by the Court of Claims judge to have intentionally constructed the pond in the path of a warm water flow" which "directly resulted in the pond's deceptive appearance and, in a sense, created a trap for those crossing its surface." *Gerzeski v Dep't of State Hwys,* 403 Mich 149, 162; 268 NW2d 525 (1978) (MOODY, J.).

[8] Or indeed another person in a courthouse or on the street.

[9] The plaintiffs were in court to testify against the attacker.

[10] 4 Restatement Torts, 2d, § 821B, p 87.

[11] Cf. *Williams v Cunningham Drug Stores, Inc,* 429 Mich 495; 418 NW2d 381 (1988).

right common to the general public.[12]

ARCHER, J. (*concurring in part and dissenting in part*). I agree with the lead opinion that there is a trespass and a nuisance exception to governmental immunity. However, the lead opinion's definition of the tort of trespass-nuisance is too narrow. In their analysis, the lead opinion discusses the torts of trespass and nuisance as though these torts constitute a single category. Prior decisions have generally considered these torts individually because of the differing interests involved. Our Court has discussed a broader interpretation of the nuisance exception.[1] I would hold that trespass, nuisance, and intentional nuisance, as well as nuisance per se, are exceptions to governmental immunity.

Our interpretation of the nuisance exception to governmental immunity begins with § 7 of the governmental tort liability act, MCL 691.1407; MSA 3.996(107), which provided:

> Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed.[2]

---

[12] I would decide the building exception question in *Landry* on the merits.

[1] *Gerzeski v Dep't of State Hwys,* 403 Mich 149; 268 NW2d 525 (1978); *Rosario v City of Lansing,* 403 Mich 124; 268 NW2d 230 (1978).

[2] The statute was amended in 1986 and provides:

> Except as otherwise provided in this act, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or

I agree with the lead opinion that under the second sentence of § 7 the exceptions to governmental immunity which existed prior to the enactment of the statute are retained. In addition, the Legislature has enacted exceptions to governmental immunity.[3]

---

discharge of a governmental function. Except as otherwise provided in this act, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

[3] As the Court determined in *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567, 591-592; 363 NW2d 641 (1984):

1) All governmental agencies (state and local) are statutorily liable for injuries arising out of the failure to keep highways in reasonable repair (MCL 691.1402; MSA 3.996[102]), negligent operation of a government-owned motor vehicle by an officer, agent, or employee (MCL 691.1405; MSA 3.996[105]), and dangerous or defective conditions in public buildings under the agency's control (MCL 691.1406; MSA 3.996[106]).

2) All governmental agencies (state and local) have tort liability for injuries arising out of the performance of a proprietary function. "Proprietary function" is defined as any activity conducted primarily for pecuniary profit, excluding activities normally supported by taxes or fees (see MCL 691.1413; MSA 3.996[113]).

\* \* \*

4) All governmental agencies (state and local) are vicariously liable for the negligent operation of government-owned motor vehicles by their officers, employees, and agents (MCL 691.1405; MSA 3.996[105]). Vicarious liability for all other torts may be imposed on a governmental agency only when its officer, employee, or agent, acting during the course of his employment and within the scope of his authority, commits a tort while engaged in an activity which is non-governmental or proprietary, or which falls within a statutory exception.

5) Judges, legislators, and the highest executive officials of all levels of government are absolutely immune from all tort liability whenever they are acting within their respective judicial, legislative, and executive authority. Lower level officers, employees, and agents are immune from tort liability only when they are

a) acting during the course of their employment and are acting, or reasonably believe they are acting, within the scope of their authority;

b) acting in good faith; and

In describing the scope of this exception, it is important to focus on the responsibility of government for its actions or omissions, not its immunity from liability. This requires the conclusion that the Legislature did intend that the case law continue to be developed in this area to address policy-based governmental liability which may be at issue in future cases.

As the lead opinion has stated, trespass and nuisance exceptions to governmental immunity have long been recognized in Michigan.[4] The Court also has addressed the rationale for governmental liability. However, there is no need to characterize governmental actions or omissions as creating conditions amounting to a "taking" in a constitutional sense to be able to grant relief. These tort issues are adequately addressed by the case law, and there is no need in most cases to raise constitutional concerns.

I also disagree with the assertion that nuisance must amount to some kind of invasion that occurs other than on the defendant government's property. Certainly if the governmental unit acts or fails to act and thereby creates a nuisance, the governmental unit should be liable regardless of where the trespass or nuisance occurs. There should be no requirement of a physical invasion of a plaintiff's land for the governmental unit to be liable. Governmental entities own and control vast resources in this state, and should act responsibly in managing these resources. If a condition is

c) performing discretionary-decisional, as opposed to ministerial-operational, acts.

[4] See *Sheldon v Kalamazoo*, 24 Mich 383, 385 (1872).

The doctrine is entirely untenable that there can be no municipal liability for unlawful acts done by municipal authorities to the prejudice of private parties.

brought to the attention of a governmental unit and the governmental officials or officers do nothing to correct the problem, then such a condition may be a nuisance in fact. When circumstances and surroundings present such questions, the trier of fact may determine whether a nuisance in fact was created. In considering this question of fact, the jury should consider first, whether the nuisance in fact was created intentionally or negligently. Second, if negligence is found, the question is whether the condition created or resulting rises to the level of an intentional nuisance because the governmental unit failed to correct the condition. In other words, did the governmental agency intend to bring about the conditions which are in fact found to be a nuisance. See Justice MOODY's opinions in *Gerzeski* and *Rosario, supra.* I disagree with the lead opinion's characterization of the causes of action in *Gerzeski* and *Rosario,* and find that the intent of the defendant should be presented to the jury. Therefore, I agree with the lead opinion that the Court of Appeals decisions in *Hadfield v Oakland Co Drain Comm'r* and in *McCaul v Lake Odessa* should be affirmed. However, I would also affirm the decisions of the Court of Appeals in *Veeneman v Michigan* and *Landry v Detroit* on the issues of intentional nuisance.

GRIFFIN, J., took no part in the decision of these cases.